THOMAS HEITHAUS ET AL. *v.* PLANNING
AND ZONING COMMISSION OF
THE TOWN OF GREENWICH
(SC 16470)

Sullivan, C. J., and Borden, Norcott, Katz and Zarella, Js.

206

Argued June 1—officially released October 2, 2001

*Haden P. Gerrish*, for the appellant (defendant).

*Robert A. Fuller*, for the appellees (plaintiffs).

*Opinion*

SULLIVAN, C. J. The defendant, the planning and zoning commission of the town of Greenwich (zoning commission), appeals from the judgment of the trial court sustaining the appeal by the plaintiffs, Thomas Heithaus and Marguerite Heithaus, from the zoning commission's denial of their historic overlay zone application, site plan and special permit request. There are three certified issues on appeal in this matter: (1) whether the trial court properly concluded that the

process of deciding an application for an historic overlay zone designation is an administrative, rather than a legislative, function of the zoning commission and, therefore, subject to a less deferential standard of review; (2) whether the trial court concluded that the zoning commission was bound by the findings of the historic district commission, an advisory body to the zoning commission, when it recommended historic overlay designation and, if so, whether that conclusion was proper; and (3) whether the trial court properly concluded that the zoning commission's decision was not supported by substantial evidence in the record. We conclude that the trial court properly determined that the zoning commission was acting in an administrative capacity when it considered, and subsequently denied, the plaintiffs' application for historic overlay designation. On the second issue, we conclude that the trial court did not determine that the zoning commission was bound by the findings of the historic district commission, a purely advisory board. Instead, the trial court found nothing in the record to contradict the findings of the historic district commission and, therefore, concluded that there was insufficient evidence to support the zoning commission's decision. We conclude that the zoning commission was not bound by the findings of the historic district commission. On the third issue, however, we conclude that the zoning commission's denial of the plaintiffs' historic overlay application was supported by substantial evidence. We therefore reverse the judgment of the trial court to the contrary.

The following facts and procedural history are relevant to the issues on appeal. The plaintiffs own a house at 7 Nedley Lane in the town of Greenwich. The house, which constitutes the parcel of real estate involved in this appeal, is situated in a single-family residential neighborhood, zoned R-7 by the town.[1] The plaintiffs'

---

[1] An R-7 zone allows for single-family homes with a minimum lot size of 7500 square feet.

5450 square foot house was built in 1902 on a 21,756 square foot lot and was known originally as the "Hunt Estate," unique for its Dutch colonial design. The plaintiffs purchased the house in 1962 and have resided there continuously since that time. Over the years, periodic improvements have been made to the structure, many of which are not consistent with its historic nature.

In 1997, the plaintiffs filed an application to the zoning commission seeking to resubdivide their property into two lots, one containing 14,156 square feet and the house, and the other a vacant 7600 square foot lot. In a letter dated April, 25, 1997, the zoning commission denied the plaintiffs' application, concluding that, although "the proposed resubdivision meets the minimal lot size requirements of the zone, [it] would be incompatible with the character of the neighborhood by eliminating the space around the 1902 house that was provided in the 1958 subdivision and creating an adjacent smaller and more narrow lot than all the others on the street, contrary to the spirit and intent of the Subdivision Regulations . . . ." In its denial letter, the zoning commission suggested that the plaintiffs "consider requesting Historic Overlay designation with division of the house into two dwelling units . . . . Parking could be located to the rear of the house, an exterior fire escape stairway would not be required, and the appearance of the house would more closely resemble the original appearance in a landscaped setting."[2] The

---

[2] In its denial letter, the zoning commission referred to a prior application for resubdivision filed by the plaintiffs in which they had requested subdivision of the property and historic overlay designation. With that application, the plaintiffs' site plan proposed that the house be divided into three dwelling units in accordance with the bonus units available through § 6-109.1 (5) (b) of the Greenwich Municipal Code land use regulations if historic overlay designation had been granted. The plaintiffs were advised by the historic district commission to revise the site plan and propose two dwelling units, because, in the commission's view, three units would overburden not only the property itself, but also the neighborhood.

plaintiffs appealed to the town planning and zoning board of appeals (board). The board reversed the decision of the zoning commission and granted the resubdivision conditioned upon the proposed removal of a section of the house that violated the five foot sideyard minimum setback requirements for the new 7600 square foot lot. When the plaintiffs could not meet the setback requirement, they applied for a variance, which the zoning commission denied. The plaintiffs also sought at that time to increase the size of the third floor elderly conversion unit in the house from the 700 square feet permitted under § 6-109.1 (5) (b) of the Greenwich Municipal Code[3] to 1791 square feet, by removing an

---

[3] Section 6-109.1 of the Greenwich Municipal Code land use regulations provides in relevant part:

"(1) Purposes

"An Historic Overlay Zone ('HO') is hereby established for the purposes of encouraging the protection, enhancement, perpetuation and use of buildings and structures . . . and appurtenant vistas having special historical or aesthetic value which represent or reflect elements of the Town's cultural, social, economic, political and architectural history.

"(2) Procedure

"Application for HO Zone, as well as Special Permit as hereinafter mentioned, may be made by the Owner of the structure and its site by filing same with the Planning and Zoning Commission. Application for HO Zone may also be made by the Planning and Zoning Commission on its own motion. All applications shall be referred to Historic District Commission and any other consultants the Planning and Zoning Commission may choose for evaluation and recommendations. The Planning and Zoning Commission shall hold a public hearing upon all rezoning applications within sixty (60) days of their respective filing dates. (1/6/88)

"(3) Standards

"(a) The Commission may grant an HO Zone to a site where it finds that the structure . . . on the site [is] not less that 40 years old and [is] architecturally or historically notable in accordance with any or all of the following standards: (1/6/88)

"(1) the uniqueness of the structure or structures. (1/6/88)

"(2) the historical significance of the structure or structures. (1/6/88)

"(3) the distinctiveness of the architectural character of the structure or structures. (1/6/88)

"(4) The placement and/or treatment of unusual and/or historic structures on a site constitutes a unique estate setting significant to the Town's history and worthy of preservation. (1/6/88)

"(b) If the Commission finds that the standards of 3a above are met but

internal partition on the third floor. That variance request also was denied. In sum, the resubdivision was granted, but the plaintiffs were required to remove that

additionally finds, after evidence duly presented by the Owner, that there would be no reasonable use to which the property in question could be adapted under the HO Zone, it shall deny HO zoning.

"(4) Site Designation and Applicable Controls

"A site rezoned by the Commission to HO shall continue to bear its original zone designation with the initials HO appended to indicate the Historic Overlay Zone.

"All zoning regulations and controls applying to the underlying zone shall continue to govern the HO site except as amended by this section 6-109.1.

"(5) Special Permit — Use and Zoning Rights

"Upon application for Special Permit and submission of a site plan pursuant to Sections 6-15 and 6-17 and upon a finding that the standards of Section 3 are met . . . .

"(b) For structures on sites in the Residential Zones, the Commission may authorize the use of the existing buildings or structures for several dwelling units provided the total number of units shall not exceed the density determined by dividing the total lot area by the minimum lot size for the underlying zone, and multiplying the result, excluding fractions, by 1.20. The Commission may then consider any fraction of a unit as a complete unit. The difference between density permitted in the underlying zone and density permitted in the HO zone is the number of bonus units; bonus units shall be permitted only in the existing structures which caused the site to be designated an HO zone. No increase in the floor area or coverage of the existing structure shall be permitted under this subsection. (1/6/88)

"In granting approvals pursuant to Sec. (5)(b), the Commission shall assure that: (1/6/88)

"(1) the significant structures or features of the site which caused the HO designation to be granted shall be permanently protected by a setting of suitable size, shape and treatment, as delineated on the approved site plan. (1/6/88)

"(2) Any new construction (additional dwelling structures), which may be allowed on an HO zoned site as a result of a combined Historic Overlay/ Conservation Zone, shall be reviewed by consultants of the Commission's choosing to assure that the design, location and size of the new structures are compatible with and protective of the site's significant existing structures, features or natural resources, including those identified in any Environmental Assessment. (1/6/88)

"As a condition to the obtaining of a Special Permit pursuant to subsection 5a or b above, the Owner shall grant a perpetual preservation easement pursuant to Connecticut General Statutes [§§ 47-42a through 47-42c], enforceable by both the Historic District Commission and the Town of Greenwich, which shall provide for, among other things, the right of the holder of the easement to perform repairs and charge the cost thereof to

part of the main structure that violated the minimum sideyard setback requirements, and they were prohibited from expanding the elderly conversion unit.[4]

In May, 1998, the plaintiffs, through their agent, James G. Sandy, again submitted this application to the zoning commission for a redesignation of their property from an R-7 to an R-7-HO, historic overlay zone, pursuant to § 6-109.1 of the Greenwich Municipal Code land use regulations. The plaintiffs claimed that the structure met the standards of § 6-109.1 (3) (a) (1), (2), (3) and (4) because of its unique design, historical significance and distinctive architectural character. In accordance with § 6-109.1 (5) (b), the plaintiffs also submitted a related site plan and special permit request, which, if historic overlay zone designation had been granted, would have created two units within the existing structure including one large first and second floor unit, and one unit on the third floor in which the plaintiffs would

the Owner upon the Owner's failure to keep the exterior of the structure in good repair. New construction shall be subject to controls established for 'associated buildings' in the Town's Model Easement and Declaration of Preservation Restrictions. (1/6/88)

"(6) Special Permit — Alterations and Additions.

"(a) No reconstruction, alteration, demolition, or addition shall be made to the exterior of any existing structure nor shall any additional structure be constructed upon a site in the HO zone, unless there shall have been received a special permit upon application thereof from the Commission pursuant to Section 6-17. In issuing such special permit the Commission shall consider the effects of the proposed work upon the protection, enhancement, perpetuation and use of the structure(s) which cause it to meet the standards set forth in Section 3 hereinabove. Ordinary maintenance and repair for which no building permit is required by the Building Code of the State of Connecticut shall be excepted from this requirement. (1/6/88)

"(b) Minor work which is limited to a change in, addition to, or removal from the parts, elements or materials of the exterior of a structure, shall be excepted from the Special permit requirement of Sec. 6a provided that a certificate of appropriateness is issued by the Historic District Commission. . . . "

[4] There is nothing in the record to indicate that any structural changes were made at that time in an effort to meet the sideyard minimum setback requirements.

reside.[5] Access to the third floor unit would have been by an elevator to be constructed within the interior of the dwelling as well as by existing stairways.

The historic overlay zone application, the site plan and the special permit request also were submitted to the historic district commission for evaluation and eventual recommendation to the zoning commission. In a letter dated July 29, 1998, the historic district commission recommended to the zoning commission that the plaintiffs' application be approved, despite the fact that many of the structure's "original architectural details [had] been lost."

Notwithstanding the evaluation and recommendation of the historic district commission, however, the zoning commission denied the historic overlay zone application on the grounds that the house and property failed to meet the standards set forth in §. 6-109.1 (3) (a). The site plan and special permit requests to convert the house into a two-family residence also were denied. The zoning commission concluded that "the proposed re-zoning of this property to an Historic Overlay Zone for 2 residences in this large building on this 14,000+ [square foot] lot would not be appropriate or in keeping with the character of the single family neighborhood . . . ."

The plaintiffs appealed to the trial court pursuant to General Statutes §§ 8-8 (b) and 8-9.[6] The trial court,

---

[5] The plaintiffs had wanted to convert the entire third floor of the house into a separate apartment by expanding the entire elderly conversion unit. The plaintiffs filed this site plan and special permit application pursuant to § 6-109.1 (5) (b) of the Greenwich Municipal Code, which allows "bonus units" for structures on sites in residential zones that are granted historic overlay zone designation. Section 6-109.1 (5) (b) provides that "the Commission may authorize the use of the existing buildings or structures for several dwelling units provided the total number of units shall not exceed the density determined by dividing the total lot area by the minimum lot size for the underlying zone, and multiplying the result, excluding fractions, by 1.20. . . ."

[6] General Statutes § 8-8 (b) provides: "Except as provided in subsections (c), (d) and (q) of this section and sections 7-147 and 7-147i, any person

*Hickey, J.*, sustained the appeal, concluding that historic overlay zone designation should have been granted because the historic district commission had found that the plaintiffs' property satisfied the standards in § 6-109.1 (3) (a) and had recommended the granting of the application. Therefore, the trial court concluded that the zoning commission had abused its discretion by denying the application and the related site plan and special permit request despite the historic district commission's recommendations, without evaluating the merits of the site plan and special permit application separate from the request for historic overlay zone designation.

In reaching its conclusion, the trial court determined that the zoning commission had acted in an administrative capacity in considering the plaintiffs' application for historic overlay zone designation. The trial court reached this conclusion by comparing an historic overlay zone to both a special permit and a floating zone. The trial court concluded that an historic overlay zone was more like a special permit than a floating zone.[7]

aggrieved by any decision of a board may take an appeal to the superior court for the judicial district in which the municipality is located. The appeal shall be commenced by service of process in accordance with subsections (e) and (f) of this section within fifteen days from the date that notice of the decision was published as required by the general statutes. The appeal shall be returned to court in the same manner and within the same period of time as prescribed for civil actions brought to that court."

Pursuant to General Statutes § 8-9, "[a]ppeals from zoning commissions and planning and zoning commissions may be taken to the Superior Court and, upon certification for review, to the Appellate Court in the manner provided in section 8-8."

General Statutes § 8-6 (a) (3) provides in relevant part that the zoning commission has both the power and the duty "to determine and vary the application of the zoning . . . regulations in harmony with their general purpose and intent . . . . " "Review of an action of a planning and zoning agency exists only under statutory authority," and such reviews are permitted pursuant to §§ 8-8 and 8-9. (Citations omitted; internal quotation marks omitted.) *Bell* v. *Planning & Zoning Commission*, 174 Conn. 493, 495, 391 A.2d 154 (1978).

[7] The trial court noted that "[u]nlike a typical floating zone . . . the property in an [historic overlay] zone continues to bear its original zone designa-

Acting on the basis of this conclusion, the trial court held that: (1) "the record [revealed] nothing to contradict the findings of the historic district commission that [the] property met at least one, if not all, of the standards of § 6-109.1 (3) (a) and [the plaintiffs] should have been granted an [historic overlay] zone designation" based on the findings of the historic district commission; and (2) "the [zoning] commission acted illegally, arbitrarily or in abuse of its discretion in denying [the plaintiffs'] application for an [historic overlay] zone designation." The trial court then concluded that the zoning commission had acted improperly and in abuse of its discretion by denying the plaintiffs' site plan and special permit applications solely because of the denial of the historic overlay zone application. The trial court determined that, because the zoning commission had not considered the merits of the site plan and special permit request separately from the application for historic overlay zone designation, that issue should be remanded to the zoning commission for proper consideration.

The trial court remanded the matter to the zoning commission for proper consideration of the site plan and special permit application in accordance with § 6-109.1 (5) of the Greenwich Municipal Code land use regulations. The zoning commission appealed from the judgment of the trial court to the Appellate Court. We

tion, but adopts an overlay. . . . All of the regulations, responsibilities and controls associated with the underlying zone continue to apply to the property except as amended by § 6-109.1 [4]." On the basis of this evaluation of the historic overlay zone, the trial court concluded that it was more like a special permit than a floating zone. "The special [permit] is the product of administrative action, while the floating zone is the product of legislative action. . . . [I]f a landowner meets the conditions set forth for a special exception, the [zoning commission] is bound to grant one, but in the case of a floating zone discretion is maintained and additional limitations may be imposed . . . because [the zoning commission] is acting legislatively." (Citation omitted.) *Sheridan* v. *Planning Board*, 159 Conn. 1, 16, 266 A.2d 396 (1969).

transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

## I

## STANDARD OF REVIEW

In order to determine the proper standard of review, we first must consider whether the trial court properly concluded that the process of acting on a request for an historic overlay zone designation is an administrative function of the zoning commission. "Legislative decisions reached by [a zoning] commission must be upheld by the trial court if they are reasonably supported by the record." (Internal quotation marks omitted.) *Kaufman* v. *Zoning Commission*, 232 Conn. 122, 151, 653 A.2d 798 (1995). "In appeals from administrative zoning decisions, by contrast, the decisions will be invalidated even if they were reasonably supported by the record, if they were not supported by 'substantial' evidence in that record." Id. The trial court compared the historic overlay zone with a special permit, or special exception, the granting of which is an administrative function; *Irwin* v. *Planning & Zoning Commission*, 244 Conn. 619, 627, 711 A.2d 675 (1998); and with a floating zone, the creation of which is a legislative function; *Sheridan* v. *Planning Board*, 159 Conn. 1, 16, 266 A.2d 396 (1969); in order to determine which zoning device was more akin to historic overlay designation.

The zoning commission claims that the trial court improperly concluded that an historic overlay zone is more like a special permit than a floating zone. We disagree. "A special permit allows a property owner to use his property in a manner expressly permitted by the local zoning regulations. . . . The proposed use, however, must satisfy standards set forth in the zoning regulations themselves as well as the conditions necessary to protect the public health, safety, convenience

and property values." (Citations omitted; internal quotation marks omitted.) *A. P. & W. Holding Corp.* v. *Planning & Zoning Board*, 167 Conn. 182, 185, 355 A.2d 91 (1974); see also General Statutes § 8-2.[8] An application for a special permit seeks permission to vary the use of a particular piece of property from that for which it is zoned, without offending the uses permitted as of right in the particular zoning district. See *Irwin* v. *Planning & Zoning Commission*, supra, 244 Conn. 627;

[8] General Statutes § 8-2 provides in relevant part: "(a) The zoning commission of each city, town or borough is authorized to regulate, within the limits of such municipality, the height, number of stories and size of buildings and other structures; the percentage of the area of the lot that may be occupied; the size of yards, courts and other open spaces; the density of population and the location and use of buildings, structures and land for trade, industry, residence or other purposes . . . . Such zoning commission may divide the municipality into districts of such number, shape and area as may be best suited to carry out the purposes of this chapter; and, within such districts, it may regulate the erection, construction, reconstruction, alteration or use of buildings or structures and the use of land. All such regulations shall be uniform for each class or kind of buildings, structures or use of land throughout each district, but the regulations in one district may differ from those in another district, and may provide that certain classes or kinds of buildings, structures or uses of land are permitted only after obtaining a special permit or special exception from a zoning commission, planning commission, combined planning and zoning commission or zoning board of appeals, whichever commission or board the regulations may, notwithstanding any special act to the contrary, designate, subject to standards set forth in the regulations and to conditions necessary to protect the public health, safety, convenience and property values. Such regulations shall be made in accordance with a comprehensive plan and in adopting such regulations the commission shall consider the plan of conservation and development prepared under section 8-23. Such regulations shall be designed to lessen congestion in the streets; to secure safety from fire, panic, flood and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population and to facilitate the adequate provision for transportation, water, sewerage, schools, parks and other public requirements. Such regulations shall be made with reasonable consideration as to the character of the district and its peculiar suitability for particular uses and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such municipality. . . . Zoning regulations may be made with reasonable consideration for the protection of historic factors . . . ."

*Barberino Realty & Development Corp.* v. *Planning & Zoning Commission,* 222 Conn. 607, 613, 610 A.2d 1205 (1992). When a special permit is issued, the affected property may be allowed an exception to the underlying zoning regulations, but it continues to be governed in the same manner as provided in the overall comprehensive plan. "When ruling upon an application for a special permit, a planning and zoning board acts in an administrative capacity. . . . [Its] function . . . [is] to decide within prescribed limits and consistent with the exercise of [its] legal discretion, whether a particular section of the zoning regulations applies to a given situation and the manner in which it does apply." (Citations omitted; internal quotation marks omitted.) *Irwin* v. *Planning & Zoning Commission,* supra, 627.

Unlike the special permit, a floating zone is the product of legislative action. *Sheridan* v. *Planning Board,* supra, 159 Conn. 16. "A floating zone is a special detailed use district of undetermined location in which the proposed kind, size and form of structures must be preapproved. It is legislatively predeemed compatible with the area in which it eventually locates if specified standards are met and the particular application is not unreasonable. . . . It differs from the traditional Euclidean zone in that it has no defined boundaries and is said to float over the entire area where it may eventually be established." (Citations omitted; internal quotation marks omitted.) *Schwartz* v. *Town Plan & Zoning Commission,* 168 Conn. 20, 22, 357 A.2d 495 (1975), and cases cited therein. A floating zone, unlike a special permit, carves a new zone out of an existing one. See *Sheridan* v. *Planning Board,* supra, 17; see also *Schwartz* v. *Town Plan & Zoning Commission,* supra, 22–26 (floating zone application equal to request for zone change).

Zone changes are governed by a two part test: "(1) The zone change must be in accord with a comprehen-

sive plan, General Statutes § 8-2, *Summ* v. *Zoning Commission*, 150 Conn. 79, 87, 186 A.2d 160 [1962], and (2) it must be reasonably related to the normal police power purposes enumerated in § 8-2; *Summ* v. *Zoning Commission*, supra, 91; see also 'The Connecticut Law of Zoning,' 41 Conn. B.J. 262, 272." *First Hartford Realty Corp.* v. *Plan & Zoning Commission*, 165 Conn. 533, 541, 338 A.2d 490 (1973). "A comprehensive plan has been defined as a general plan to control and direct the use and development of property in a municipality or a large part thereof by dividing it into districts according to the present and potential use of the properties." *Summ* v. *Zoning Commission*, supra, 87. "The requirement of a comprehensive plan is generally satisfied when the zoning authority acts with the intention of promoting the best interests of the entire community." *First Hartford Realty Corp.* v. *Plan & Zoning Commission*, supra, 541.

The trial court noted that "[t]he [historic overlay] zone is similar to a floating zone in that its location is undetermined, and the type of property to which such a designation would be granted is pre-approved." Cf. *Sheridan* v. *Planning Board*, supra, 159 Conn. 16. The trial court concluded that "[u]nlike a typical floating zone, however, the property in an [historic overlay] zone continues to bear its original zone designation, but adopts an overlay. . . . All of the regulations, responsibilities and controls associated with the underlying zone continue to apply to the property except as amended by § 6-109.1 (4). [Thus] if a property is granted an [historic overlay] designation, there are few additional regulations, responsibilities or controls placed upon the site unless the owner applies for a special permit that would allow additional uses of the property not normally allowed in the underlying zone but allowed in the overlay zone."

We recognize that, in some respects, an historic overlay zone resembles a floating zone. For example, it generally can "float around" a town and land on historic properties. When historic overlay designation is granted, however, § 6-109.1 (4) of the Greenwich Municipal Code provides that "[a] site rezoned by the Commission to [historic overlay] shall continue to bear its original zone designation with the initials HO appended to indicate the Historic Overlay Zone. *All zoning regulations and controls applying to the underlying zone shall continue to govern the [historic overlay] site except as amended by this section . . . .*" (Emphasis added.)[9] Historic overlay designation does not change the overall zoning in the area in which the historic structure is located. Unlike a floating zone, therefore, an historic overlay zone does not affect the comprehensive plan, nor must it be "legislatively predeemed compatible with the area" in which it lands. See *Schwartz* v. *Town Plan & Zoning Commission,* supra, 168 Conn. 20.[10]

---

[9] Furthermore, the Greenwich Municipal Code has a separate provision, § 6-23, which designates historical "conservation zones," with its own set of standards and procedures. It is apparent, therefore, that the intention was to allow for the creation of historic districts, but also to accommodate those randomly located historic landmarks with devices that allowed special exceptions to the underlying zoning in exchange for preservation of the historic features.

Section 6-23 provides in relevant part: "(c) The Planning and Zoning Commission upon application . . . after a public hearing and considerations of the recommendations of the Conservation Commission, may grant a Conservation Zone consisting of less than ten (10) acres in R-7, R-12 and R-20 zones . . . when the Planning and Zoning Commission finds that such rezoning will preserve and protect particular areas and terrain which have qualities of natural beauty or value, and will . . . (3) . . . preserve and protect areas and terrain which have historic interest including the setting and landscaping of historic buildings, as may be determined by the Planning and Zoning Commission after consultation with the Historic District Commission. . . ."

[10] The overall plan in the Nedley Lane neighborhood utilized a more modern, modest style of architecture. Thus, the area was not "legislatively predeemed" an historic area.

In *Powers* v. *Common Council*, 154 Conn. 156, 222 A.2d 337 (1966), this court considered the nature of a similar zoning device known as an "area designation." In *Powers*, the plaintiff appealed after Danbury's common council had denied his application for a multiple housing area designation in an area zoned a "professional office and apartment district." The plaintiff had purchased the property with the intention of erecting a high-rise apartment building on the site. Section 3.17 of the Danbury zoning regulations provided that any area in an office and apartment district, "upon the recommendation of the City Planning Commission, may be designated by the Common Council, after a public hearing, as a multiple housing project area . . . ." Id., 158. The regulation also provided that those regulations governing the underlying district would continue to apply to any property for which multiple housing designation was granted. Id. The effect of the regulation was that a specific area in the district could be put to a special use, for example a multiple housing project area, as long as it was permitted by the regulation and was "first recommended by the planning commission and designated by the council for that use." Id., 159. We concluded that this area designation process was, in effect, a procedure for the granting of a special permit. Id., 159–60. Although neither the term "special exception" nor the term "special permit" was used in the relevant section of the Danbury zoning regulations, we held that "[t]he nomenclature [was] immaterial so long as the effect [was] the same." Id., 159. We concluded, therefore, that "[w]hen the council was considering the application for an area designation, it was acting administratively . . . [and necessarily required] standards to guide [them in acting upon an application for designation as a multiple housing project area.]" (Citation omitted.) Id., 160. We conclude that an "area designation" is similar to an historic overlay designation. In both

cases, a specific property receives a special designation allowing special uses, but the underlying zoning district regulations continue to apply.

Accordingly, we conclude that the zoning commission's consideration of an historic overlay zone application is an administrative function. See *Zachs* v. *Zoning Board of Appeals*, 218 Conn. 324, 329–30, 589 A.2d 351 (1991). "In appeals from administrative zoning decisions, the commission's conclusions will be invalidated only if they are not supported by substantial evidence in the record. . . . [E]vidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred." (Citations omitted.) *Cybulski* v. *Planning & Zoning Commission*, 43 Conn. App. 105, 110–11, 682 A.2d 1073, cert. denied, 239 Conn. 949, 686 A.2d 123 (1996). "The [commission's] decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given. . . . The evidence . . . to support any such reason [however] must be substantial . . . ." *Huck* v. *Inland Wetlands & Watercourses Agency*, 203 Conn. 525, 539–40, 525 A.2d 940 (1987).[11]

[11] The commission must determine whether "[t]he proposed use . . . [satisfies] standards set forth in the zoning regulations themselves as well as the conditions necessary to protect the public health, safety, convenience and property values. [See] General Statutes § 8-2 . . . . Acting in this administrative capacity, the [commission's] function is to determine whether the applicant's proposed use is expressly permitted under the regulations, and whether the standards set forth in the regulations and the statute are satisfied." (Citations omitted; internal quotation marks omitted.) *Housatonic Terminal Corp.* v. *Planning & Zoning Board*, 168 Conn. 304, 307, 362 A.2d 1375 (1975), citing *A. P. & W. Holding Corp.* v. *Planning & Zoning Board*, supra, 167 Conn. 185. "In fulfilling its administrative function, a zoning commission is less concerned with the development of public policy than with the correct application of law to facts in the particular case." *Kaufman* v. *Zoning Commission*, supra, 232 Conn. 151.

When a zoning commission acts on a special permit, it is required by General Statutes § 8-3c (b) to give reasons for its actions. Section 8-3c provides in relevant part: "Whenever a commission grants or denies a special permit or special exception, it shall state upon its records the reason for its decision. . . ."

II

## HISTORIC DISTRICT COMMISSION

We next consider the zoning commission's claim that the trial court improperly concluded that the zoning commission was bound by the findings of the historic district commission and, therefore, should have granted the application in light of its favorable recommendation. Pursuant to § 6-109.1 (2), the zoning commission must refer all applications to the historic district commission "and any other consultants the [zoning commission] may choose for evaluation and recommendations." The historic district commission conducts an evaluation in order to determine whether the site satisfies the requirements of § 6-109.1 (3) (a), and then makes a recommendation to the zoning commission. The zoning commission argues that the trial court improperly concluded that the zoning commission had no discretion to deny the plaintiffs' application.[12]

---

[12] In their brief, the plaintiffs argue that there is nothing in the record to contradict the historic district commission's conclusion that the property met the standards in § 6-109.1 (3) (a). The plaintiffs claim that the zoning commission improperly relied upon reports from the sewer superintendent, the town's engineering division, the building department and the historic district commission while considering the plaintiffs' historic overlay application, site plan and special permit request. Only the historic district commission's report pertained to the application for historic overlay zone designation; all of the other reports were submitted in relation to the site plan and special permit requests. The trial court concluded that historic overlay had to be approved before any action could be taken on the site plan and special permit requests because it was a hurdle for obtaining the "bonus units" available through § 6-109.1 (5) (b). The trial court concluded, therefore, that only the historic district commission's report was "[t]he appropriate report for consideration" regarding the historic overlay zone application because it was the only report that addressed the required criteria established in § 6-109.1 (3) (a). We agree. Because the zoning commission is not bound by the recommendations of the historic district commission, however, it may weigh the historic district commission's findings as one piece of evidence in considering an historic overlay application. See *Smith* v. *Zoning Board of Appeals*, 227 Conn. 71, 96–97, 629 A.2d 1089, cert. denied, 510 U.S. 1164, 114 S. Ct. 1190, 127 L. Ed. 2d 540 (1993).

Contrary to the zoning commission's claim, however, our examination of the record persuades us that the trial court merely concluded that the record revealed nothing to contradict the findings of the historic district commission that the plaintiffs' property met at least one, if not all, of the standards of § 6-109.1 (3) (a) and should have been granted historic overlay designation. Thus, the trial court clearly suggested that if the record had contained evidence to contradict the historic district commission's findings, the zoning commission would have had the discretion to weigh that evidence against the historic district commission's findings. In essence, therefore, the trial court did not find that the zoning commission was bound by the historic district commission's recommendation to grant the plaintiffs' application, but rather found that there was no evidence supporting the zoning commission's decision to deny historic overlay designation. Accordingly, we reject the zoning commission's claim.

## III

### SUBSTANTIAL EVIDENCE

We next consider the trial court's ultimate conclusion that the zoning commission's denial of the plaintiffs' application for historic overlay designation was not supported by substantial evidence in the record. The zoning commission claims that the record contained sufficient evidence to warrant denial of the plaintiffs' application. We agree with the zoning commission.

As noted previously, "[i]n appeals from administrative zoning decisions . . . the decisions will be invalidated even if they were reasonably supported by the record, if they were not supported by 'substantial' evidence in that record." *Kaufman* v. *Zoning Commission*, supra, 232 Conn. 151, citing *Huck* v. *Inland Wetlands & Watercourses Agency*, supra, 203 Conn. 540. "In an appeal from the decision of a zoning [commis-

sion], we therefore review the record to determine whether there is factual support for the [commission's] decision . . . ." *Pleasant View Farms Developers, Inc.* v. *Zoning Board of Appeals*, 218 Conn. 265, 270, 588 A.2d 1372 (1991). Should substantial evidence exist in the record to support any basis or stated reason for the zoning commission's decision, the court must sustain that decision. See *DeBeradinis* v. *Zoning Commission*, 228 Conn. 187, 199, 635 A.2d 1220 (1994).

Section 6-109.1 of the Greenwich Municipal Code sets forth the purpose, procedure, standards and controls for historic overlay zone designations. The purpose, according to § 6-109.1 (1), is to encourage "the protection, enhancement, perpetuation and use of buildings and structures . . . and appurtenant vistas having special historical or aesthetic value which represent or reflect elements of the Town's cultural, social, economic, political and architectural history." In achieving this purpose, the zoning commission is guided by the standards set forth in § 6-109.1 (3) (a), which include a structure's uniqueness, historical significance, distinct architectural character and overall worthiness of preservation. We conclude that the zoning commission adequately considered all of the factors enumerated in § 6-109.1 (3) (a) in denying the plaintiffs' application for historic overlay zone designation, and that the record contains substantial evidence supporting the zoning commission's decision.

The historic district commission sent a letter to the zoning commission in July, 1998, recommending that the plaintiffs' request for historic overlay be approved.[13]

---

[13] The record also contains a September, 1996 letter from the historic district commission to the zoning commission regarding an application for historic overlay zone designation filed by the plaintiffs in 1996. At that time, the historic district commission "considered the property historic and worthy of preservation but marginal as an [historic overlay zone] because of the following:

"1. All original exterior architectural detail and ornament had been obscured or removed during the installation of aluminum siding.

The historic district commission determined that "the building derives its historic importance because of, and not despite, its current surroundings. . . . [Therefore] the fact [that] it stands out from its neighbors warrants preservation. As it is now, the property causes a viewer to compare the present, as represented by the house's neighbors, with the past. It makes one wonder what changes the area has gone through." The historic district commission also noted, however, that "many of the original architectural details [had] been lost." Most notably, the structure's wood siding had been replaced by vinyl siding. An important factor in the historic district commission's recommendation, therefore, was the plaintiffs' agreement that "any future repairs to the home [would] render it more in keeping with its original condition." The historic district commission also noted that the plaintiffs' new site plan and special permit requests seemed to preserve the "grand home," rather than turn it into a "big building" such as a rooming house.

The zoning commission considered the historic district commission's evaluation and recommendation at a public hearing in August, 1998, and at its meeting held September 10, 1998. Neighbors opposed to the plaintiffs' application for historic overlay designation pointed out at the public hearing that there had been no neighbor-

---

"2. The property has realized much prior development through subdivision and subsequent construction and as such the structure does not exist in its original context nor present itself as a significant streetscape element to King Street.

"3. The likelihood that the structure would be demolished to further develop the property is minimal."

As a result of these findings, the historic district commission advised the plaintiffs that they would be granted historic overlay zone designation only if they provided a "detailed and thorough restoration plan for the exterior of the building" and resolved any current parking issues that marred the historic residential character of the building and current streetscape. In other words, the historic district commission recommended denial of the plaintiffs' application until there was compliance with its recommendations.

hood input into the historic district commission's report. Tom Hartch, representing two of the other neighbors and identifying himself as a past president of the Greenwich Historical Society, was quoted at the public hearing as saying that "to conclude that this altered and vinyl-covered house is historic would so dilute the word historic as to render it almost meaningless." Other neighborhood representatives expressed shock at the historic district commission's recommendation letter, considering it vague and very lax in its requirements for historic overlay designation. The historic district commission requested only that the vinyl siding be replaced with wood siding when it became necessary. The historic district commission ignored the fact that a porch on the second floor in the rear of the house had been replaced by a large window. The historic district commission also did not consider how the installation of the proposed elevator would affect the exterior appearance of the house. Furthermore, the historic district commission recommended historic overlay designation relying on promises of future repairs in keeping with the historical character of the house, rather than requiring such repairs prior to the granting of historic overlay designation.

Transcripts of both the public hearings and the zoning commission meetings were replete with evidence that the plaintiffs' house was in disrepair, that most of the changes or improvements made to the house were not consistent with its historical nature, and that the property was too small for the size of the structure. Photographs showed that the roof was in poor condition and that the landscaping had been neglected. Photographs also illustrated that the modern, modest houses surrounding the plaintiffs' house were on lots appropriate for their size and structure. Significant architectural changes in the neighborhood had rendered the plaintiffs' house no longer part of an historic streetscape.

Neighbors argued that the historical nature of the surroundings had been altered by the plaintiffs' changes to the property and that further expansion and changes would only continue to deplete its historic value. Instead, neighbors contended, and the zoning commission agreed, that the plaintiffs simply sought historic overlay designation in order to gain the "bonus units" necessary to expand the elderly conversion unit, while keeping the smaller adjacent lot for future development. Pursuant to the historic district commission's recommendation, that could be done with mere future promises of improvements and historic restoration.

At its September, 1998 meeting, the zoning commission noted that the historic district commission had "halfheartedly endorsed the concept of [the plaintiffs' property] meriting an historic overlay rezoning," and had recommended historic overlay designation only because it felt that the plaintiffs' house showed a "history of development and growth in Greenwich." The zoning commission found that conclusion to be only modestly persuasive, because the rest of the street had developed in a "more modern way." The zoning commission accepted, however, that the house might merit some consideration for historic overlay zone designation upon restoration of its original construction and landscape. The zoning commission mainly was concerned by the prior resubdivision of the plaintiffs' property in 1997, which had left the 5450 square foot house on a lot only 14,000 square feet in size. Furthermore, the house was situated next to a 7600 square foot lot that potentially would be the site of another structure as close as ten feet away. Zoning commission members also discussed the parking and site plan defects that would mar the historical character of the property.[14] In

---

[14] Neighbors pointed out that there were often as many as ten cars parked in the front of the house at one time. They argued that permitting the two-family expansion would only add to the problem.

its denial letter, the zoning commission "encouraged [the plaintiffs] to reapply for an [historic overlay] zone, [s]pecial [p]ermit and [s]ite plan for two dwelling units on the full 21,756 [square foot] lot with required parking removed from the circular drive in front and relocated to the rear of the house. . . . [The zoning commission] [a]lso require[d] . . . submission of the standard form of preservation easement with additional language for future removal of the vinyl siding when replacement of siding becomes necessary and provision for Historic District Commission examination of specific changes that will be made to the structure . . . ." Thus, the zoning commission denied the historic overlay zone application without prejudice, until the plaintiffs submitted a new application that merged the previously subdivided lots. In essence, the zoning commission indicated that it would have granted historic overlay zone designation only if there was no danger of development on the 7600 square foot lot, which would have overcrowded not only the historic landscape of the plaintiffs' property, but also the neighborhood in general.

Ultimately, all members of the zoning commission agreed that the property should not be granted historic overlay zone designation unless the plaintiffs agreed to merge the two subdivided lots and provide a new site plan showing how the entire property would be designed in accordance with the historical nature of the original lot. When these conditions were met, the zoning commission would reconsider the plaintiffs' application for historical overlay designation. As a result, the plaintiffs would not be eligible for the bonus units permitted by § 6-109.1 (5) (b) for the third floor elderly conversion unit until the standards for historic overlay designation were met. We conclude that the zoning commission reasonably could have found that the plaintiffs' property did not warrant historic overlay designation in its current condition and setting. The

record contains substantial evidence that the plaintiffs' proposal did not satisfy § 6-109.1 (3) (a) because the house required certain repairs in keeping with its historical nature, and the subdivided lots would have to be merged in order for the lot size to accent the large, historic nature of the house.

The judgment is reversed and the case is remanded with direction to render judgment dismissing the plaintiffs' appeal.

In this opinion the other justices concurred.