DONNA DUTKO *v.* PLANNING AND ZONING BOARD
OF THE CITY OF MILFORD
(AC 28695)

Flynn, C. J., and Robinson and Berdon, Js.

Argued May 20—officially released September 16, 2008

*Michael C. Jankovsky*, for the appellant (plaintiff).

*Matthew B. Woods*, with whom, on the brief, was *Cynthia C. Anger*, assistant city attorney, for the appellee (defendant).

*Opinion*

FLYNN, C. J. This certified appeal arises out of the decision of the defendant, the planning and zoning board of the city of Milford (board), not to extend the Milford center design development district (MCDD) to include other nearby properties. The plaintiff, Donna Dutko, appealed from the board's decision to the Superior Court, which dismissed the appeal, concluding that the board properly declined to exercise its legislative

authority to extend the MCDD. The plaintiff now appeals, claiming that (1) the trial court utilized an improper standard of review, (2) the court wrongly concluded that the board's decision was based on proper considerations and (3) the board failed to take the plan of conservation and development (plan) into consideration when rendering its decision. We affirm the judgment of the trial court.

The following facts are relevant to our consideration of the plaintiff's appeal. On December 2, 2003, the board created the MCDD, which included several properties around the plaintiff's property. The MCDD allows mixed uses, including multifamily residential and commercial uses. Early in 2004, the board, sua sponte, again considered whether to expand the MCDD to include the plaintiff's property, located at 75 High Street, and two other properties, located at 67 High Street and 83-85 High Street. On May 4, 2004, the board voted not to extend the zone. The plaintiff appealed from the board's decision to the Superior Court, which dismissed the appeal on its merits. Upon our granting certification to appeal, this appeal followed.

I

The plaintiff claims that the court utilized a less stringent standard of review when assessing the merits of her appeal from the board's decision. She argues that the court acted improperly "in holding that there was 'adequate' or 'sufficient' evidence to support [the] board's decision when the applicable standard of review is 'substantial' evidence." We conclude that this claim lacks merit.

"In voting [on the appropriateness of a] zone change of . . . property, [a planning and zoning authority] exercise[s] a legislative function . . . as distinguished from an administrative one. . . . Acting in such a legislative capacity, the [planning and zoning authority] has

wide and liberal discretion . . . and is free to amend its regulations whenever time, experience, and responsible planning for contemporary or future conditions reasonably indicate the need for a change." (Citations omitted; internal quotation marks omitted.) *West Hartford Interfaith Coalition, Inc.* v. *Town Council*, 228 Conn. 498, 505 n.10, 636 A.2d 1342 (1994). "Legislative decisions reached by [a planning and zoning] commission must be upheld by the trial court if they are *reasonably supported by the record.* . . . In appeals from administrative zoning decisions, by contrast, the decisions will be invalidated even if they were reasonably supported by the record, if they were not supported by substantial evidence in that record." (Citation omitted; emphasis added; internal quotation marks omitted.) *Heithaus* v. *Planning & Zoning Commission*, 258 Conn. 205, 215, 779 A.2d 750 (2001); see *Konigsberg* v. *Board of Aldermen*, 283 Conn. 553, 582, 930 A.2d 1 (2007); *Kaufman* v. *Zoning Commission*, 232 Conn. 122, 151–53, 653 A.2d 798 (1995); *Cottle* v. *Planning & Zoning Commission*, 100 Conn. App. 291, 294–95, 917 A.2d 1030 (2007).

In the present case, there is no dispute that the board was acting in a legislative capacity when considering whether the MCDD should be expanded. Accordingly, the standard to be employed by the trial court when reviewing the board's decision was whether there was reasonable support in the record to sustain the board's decision. Contrary to the plaintiff's claim, the substantial evidence standard is applicable to administrative actions, not to legislative actions. Accordingly, we conclude that the court used the proper standard in assessing the merits of the plaintiff's appeal.

II

The plaintiff next claims that the trial court wrongly concluded that the board's decision reasonably was supported by the record and was not clearly erroneous.

She argues that "the board voted against the zone change because 'the historic residential character [of the area] should be preserved' and 'revising the zoning map and moving the [MCDD] boundary [would] have an adverse impact on neighboring residential properties.'" She further argues that the court was "confined to whether those [stated] grounds were valid and supported by the record," which, she argues, they were not. The board argues that the court correctly concluded that the board had legislative discretion to deny the zone change. We agree with the board.

Our Supreme Court often has articulated the proper, limited scope of judicial review of a decision of a local planning and zoning authority. "[T]he commission, acting in a legislative capacity, [has] broad authority to adopt [zoning] amendments. . . . In such circumstances, it is not the function of the court to retry the case. Conclusions reached by the commission must be upheld by the trial court if they are reasonably supported by the record. The credibility of the witnesses and the determination of issues of fact are matters solely within the province of the agency. The question is not whether the trial court would have reached the same conclusion but whether the record before the agency supports the decision reached. . . . Acting in such legislative capacity, the local board is free to amend [or decline to amend] its regulations whenever time, experience, and responsible planning for contemporary or future conditions reasonably indicate the need for a change. . . . The discretion of a legislative body, because of its constituted role as formulator of public policy, is much broader than that of an administrative board, which serves a quasi-judicial function. . . . This legislative discretion is wide and liberal, and must not be disturbed by the courts unless the party aggrieved by that decision establishes that the commission acted arbitrarily or illegally. . . . Zoning must be

sufficiently flexible to meet the demands of increased population and evolutionary changes in such fields as architecture, transportation, and redevelopment. . . . The responsibility for meeting these demands rests, under our law, with the reasoned discretion of each municipality acting through its duly authorized zoning commission." (Citations omitted; internal quotation marks omitted.) *Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission*, 220 Conn. 527, 542–43, 600 A.2d 757 (1991).

"Appeals from legislative zoning decisions require a showing that the commission has acted arbitrarily . . . illegally . . . or in abuse of discretion. . . . Legislative decisions reached by [a planning and zoning] commission must be upheld by the trial court if they are reasonably supported by the record. . . . A zoning commission is not required to give reasons for denying a zone change application [but] [w]here reasons are given, it is sufficient if any one of the reasons would be a valid basis to deny the application. R. Fuller, 9A Connecticut Practice Series: Land Use Law and Practice (3d Ed. 2007) § 33:2, p. 236. In accordance with these principles, in [an] appeal from the commission's [legislative] decision, the commission's only burden before the trial court [is] to show that the record before the [commission] support[ed] the decision . . . and that the commission did not act arbitrarily . . . illegally . . . or in abuse of discretion." (Citation omitted; internal quotation marks omitted.) *Cottle* v. *Planning & Zoning Commission*, supra, 100 Conn. App. 294–95.

At its May 4, 2004 meeting, board members voiced their reasons for not wanting to expand the MCDD. Board member Frank J. Goodrich initially moved that the board "not change the zoning map designation from R-7.5 to MCDD for properties located at 67, 75 and 83-85 High Street for the following reasons: (1) the historic

residential character of High Street should be preserved; (2) revising the zoning map and moving the MCDD boundary will have an adverse impact on the neighboring residential properties; [and] (3) the owner of the property at 83-85 High Street testified at the public hearing [that] he does not want his zoning changed and submitted a letter on behalf of the owner of 67 High Street that she [does] not want the zone changed." The motion was seconded by board member John Ludtke. The board then discussed the matter in some detail. Ludtke explained that the plaintiff's "house is a significant historical building" and that he believed that "it should be preserved."

Board member Nanci Seltzer explained that although the MCDD is nearby, the property at 75 High Street, which is the plaintiff's property, is not surrounded by the MCDD but, rather, has residential homes on both sides of it. She acknowledged that the property to the rear of 75 High Street was commercial and that the property across the street housed a utility company. She also expressed her opinion that these remaining residential High Street properties should remain residential. Board member Jeanne K. Cervin also expressed her opinion, stating that she thought that these properties had significant historical value to the city.

The board's chairperson, John Jansen, explained that in his opinion, "the argument that this property is surrounded by commercial [property] is not valid . . . ." He also explained that this property has "always been residential" and that the board, previously, "ha[d] determined that it should just remain as it has been for years." He stated that he did not "see any basis for making the change." After further discussion by the members, the board voted seven to none in support of the motion not to make a change, with three members abstaining because they were not present at the public hearing.

On appeal, the plaintiff argues that the board acted improperly in declining to expand the MCDD on the stated grounds because "the board had no authority or guidance to consider the historical significance of the area, let alone base its decision on historic preservation" and because "no historic district existed at the time of the hearing . . . ." The board argues that it properly could consider the historic nature of the area, despite not having a designated historic district in the city. Additionally, the board argues that it also declined to expand the zone because of the residential character of the area and the desire to preserve that character, which reason, it argues, the plaintiff fails to challenge or even mention in her brief. We agree with the board.

On appeal, we must uphold the decision of the board if any of its stated reasons reasonably are supported by the record. See *Heithaus* v. *Planning & Zoning Commission*, supra, 258 Conn. 215. In rendering its decision, the board had before it the following relevant evidence in opposition to the expansion of the MCDD. More than twenty-five letters were submitted to the board by area residents, each stating that the signatories were opposed to a rezoning of 67, 75 and 83-85 High Street because they desired to preserve "the historically residential character of the neighborhood." Petitions signed by homeowners and residents of High Street also were submitted to the board, stating that the signatories were against expanding the MCDD to these properties because it would "cause irreparable harm to a residential neighborhood with predominately historic homes [and the expansion would change] the residential character of the neighborhood and [subject] the neighborhood to creeping development."

Additionally, the board had before it a letter from Jose Giner, a member of the American Institute of Certified Planners, whom the board had hired as an independent planner to look at this issue. Giner confirmed in his

letter that he had inspected the neighborhood and "noted that there is a marked contrast in the character of the streetscape when one turns onto High Street from South Broad Street. The predominant character of the area immediately west of the current [MCDD] line is residential in nature." He noted that the "residential uses appear stable and thriving [and that the] residential properties appear fully occupied and well kept." He further opined that "in reviewing the record, there were concerns regarding the retention of the historic character of the neighborhood in which the subject property is located. The current [z]oning regulation for the [MCDD] would not offer much if any protection for the retention of the structures [and] changing [the current zone] to [MCDD] will not promote the retention of the historic character of the neighborhood."

During the April 20, 2004 public hearing, the board also was presented with three Connecticut historical commission historic resources inventory forms, one for each of the subject properties, by Richard N. Platt, Jr., the city historian. Apparently, these forms had been filed with the state in 1977. Each form described the relevant property and noted that each was located in a "residential neighborhood, just south of [the] commercial area of Broad Street, [having a ] high concentration of historic homes." Platt spoke against expanding the MCDD, noting that this area always has been residential. Platt also stated that the mayor recently had appointed a historic district study committee to look at designating this area as a historic district.

Peter Moen, the owner of 83-85 High Street spoke in opposition to expanding the MCDD, stating that he "wish[ed] to go on record with [his] opposition to any change in zoning from R-7.5 of this historic property [because] the property was purportedly built in 1745, making it one of the ten oldest properties in Milford." He then "urge[d] the board to consider [its] role as

temporary custodian of [the city's] common heritage and the immediate and irreversible devastating effect a change in zoning to MCDD of [his] property and any adjacent properties [would] have on this historic residential neighborhood." Moen also submitted a letter written by his mother-in-law, Ruth Merwin MacMaster, opposing the expansion of the MCDD to include her property at 67 High Street. Many other residents of the neighborhood also spoke against expanding the MCDD to these properties.

The plaintiff argues that the board had no authority to refuse to expand the MCDD on the basis of "the historic residential character" of the area. Despite this argument, at the April 20, 2004 hearing, her attorney, David Quatrella, although arguing that the plaintiff's property was not historical, stated that he was "not denying that there are historical properties in this neighborhood." He also stated: "Simply because it is an old structure, does not make it historically significant. This is a vinyl sided house; this is not, it is not of any . . . architectural significance or design, and it is not a house that we feel qualifies as a historical structure." After Quatrella spoke, Platt gave a final comment, stating: "I just wanted to speak to one rather extraordinary statement we just heard that number 75—just because it is old, it is not historic. There, I guess the people who put it on the historic resources inventory list must have been wrong." With that said, chairman Jansen closed the public hearing.

The board voted to approve the motion that Goodrich made at the May 4, 2004 board meeting "not [to] change the zoning map designation from R-7.5 to MCDD for properties located at 67, 75 and 83-85 High Street for the following reasons: (1) the historic residential character of High Street should be preserved; (2) revising the zoning map and moving the MCDD boundary will have an adverse impact on the neighboring residential

properties; [and] (3) the owner of the property at 83-85 High Street testified at the public hearing [that] he does not want his zoning changed and submitted a letter of behalf of the owner of 67 High Street that she [does] not want the zone changed."

We begin by looking at the third reason stated by the board for not expanding the MCDD, namely, that the owners of two of the three properties that would have been affected by the zone change were not in favor of the change. There is no doubt that this reason finds considerable support in the record. We also are drawn to § 10.5 of the Milford zoning regulations, which states: "Where a protest is filed with the . . . board at a public hearing on a proposed amendment signed by the owners of 20 percent or more of the area of the lots included in such proposed change, or of the lots within 500 feet in all directions of the lots included in the proposed change, such change shall not be adopted except by a vote of two-third of the entire membership of said [b]oard." Additionally, we note that the plaintiff does not challenge this reason or make any argument as to whether this reason alone would or would not be sufficient to support the board's decision. Nevertheless, we also look for support in the record for the other reasons cited by the board.

Certainly there were many people who stated that they opposed the expansion of the MCDD because they wanted to maintain the historical character of the neighborhood. Giner, the board's expert, noted that this area was residential in nature and that rezoning this area to the MCDD "would not offer much if any protection for the retention of the structures . . . ." He also opined that "changing [the current zone] to [MCDD] will not promote the retention of the historic character of the neighborhood." The board also had before it Connecticut historical commission historic resources inventory forms that listed these properties and stated that they

were "in an area highly concentrated with historic homes." Quatrella, himself, admitted that there were "historical properties in this neighborhood." More than twenty-five letters were submitted to the board, each stating that the signatories were opposed to a rezoning of this area because they desired to preserve "the historically residential character of the neighborhood." Accordingly, the record reasonably supports the board's decision "not [to] change the zoning map designation from R-7.5 to MCDD for properties located at 67, 75 and 83-85 High Street [because] . . . the historic residential character of High Street should be preserved . . . ."

As to the final reason stated by the board for not expanding the MCDD, namely, that "revising the zoning map and moving the MCDD boundary will have an adverse impact on the neighboring residential properties," despite the plaintiff's failure to challenge this reason, after reviewing the record, we conclude that it also finds reasonable support in the record. The board had before it several petitions that were signed by homeowners and residents of High Street, stating that they were against expanding the MCDD to include the subject properties because the expansion would "cause irreparable harm to a residential neighborhood with predominately historic homes . . . [and the expansion would change] the residential character of the neighborhood and [subject] the neighborhood to creeping development." Many of these residents also spoke at the public hearing reiterating what was expressed in the petitions. Giner also opined that the "predominant character" of the subject area is residential and that changing the zone would not promote the preservation of the character of the neighborhood. Accordingly, we conclude that the board's decision finds reasonable support in the record.

## III

The plaintiff's final claim on appeal is that "[i]n violation of General Statutes §§ 8-2, 8-3 and 8-23,[1] the board

[1] General Statutes § 8-2 (a) provides in relevant part: "[Zoning] regulations shall be made in accordance with a comprehensive plan and in adopting such regulations the commission shall consider the plan of conservation and development prepared under section 8-23. Such regulations shall be designed to lessen congestion in the streets; to secure safety from fire, panic, flood and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population and to facilitate the adequate provision for transportation, water, sewerage, schools, parks and other public requirements. Such regulations shall be made with reasonable consideration as to the character of the district and its peculiar suitability for particular uses and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such municipality. . . ."

General Statutes § 8-3 (b) provides: "[Zoning] regulations and boundaries shall be established, changed or repealed only by a majority vote of all the members of the zoning commission, except as otherwise provided in this chapter. In making its decision the commission shall take into consideration the plan of conservation and development, prepared pursuant to section 8-23, and shall state on the record its findings on consistency of the proposed establishment, change or repeal of such regulations and boundaries with such plan. If a protest against a proposed change is filed at or before a hearing with the zoning commission, signed by the owners of twenty per cent or more of the area of the lots included in such proposed change or of the lots within five hundred feet in all directions of the property included in the proposed change, such change shall not be adopted except by a vote of two-thirds of all the members of the commission."

General Statutes § 8-23 (d) provides in relevant part: "(1) [The] plan of conservation and development shall (A) be a statement of policies, goals and standards for the physical and economic development of the municipality . . . (C) be designed to promote, with the greatest efficiency and economy, the coordinated development of the municipality and the general welfare and prosperity of its people and identify areas where it is feasible and prudent . . . (D) recommend the most desirable use of land within the municipality for residential, recreational, commercial, industrial, conservation and other purposes and include a map showing such proposed land uses, (E) recommend the most desirable density of population in the several parts of the municipality . . . (H) promote housing choice and economic diversity in housing, including housing for both low and moderate income households, and encourage the development of housing which will meet the housing needs identified in the housing plan prepared pursuant to section 8-37t and in the housing component and the other components of the state

and the Superior Court failed to consider the [plan] and specifically state why they departed from [the plan]." The plaintiff argues that "[d]espite the fact that the [plan] includes 75 High Street in the MCDD, the board decided not to include it in said zone, and the Superior Court upheld that decision. . . . [E]ven if the board was not required to specifically comply with the [plan], it was not free to ignore it." (Citations omitted.) After reviewing the record, we conclude that the board did take into consideration the plan, and, accordingly, we are not persuaded by the plaintiff's claim.

"While courts seldom second guess a zoning commission on zone change applications, the decision is more likely to be upheld if it is based upon the material considerations for a zone change, namely conformity with the comprehensive plan and a use which meets one of the police power purposes in § 8-2 of the General Statutes." 9 R. Fuller, supra, § 21:10, p. 623. "A comprehensive plan has been defined as a general plan to control and direct the use and development of property in a municipality or a large part thereof by dividing it into districts according to the present and potential use of the properties. . . . The requirement of a comprehensive plan is generally satisfied when the zoning authority acts with the intention of promoting the best interests of the entire community. . . . It is established that the comprehensive plan is to be found in the zoning regulations themselves and the zoning map, which are primarily concerned with the use of property." (Citation omitted; internal quotation marks omitted.) *Konigsberg* v. *Board of Aldermen*, supra, 283 Conn. 584–85. "[I]n making its decision regarding a zone change, a zoning agency must consider the general public welfare inherent in the comprehensive zoning development plan

plan of conservation and development prepared pursuant to chapter 297. In preparing such plan the commission shall consider focusing development and revitalization in areas with existing or planned physical infrastructure."

rather than the individual benefit of one petitioner." *Fenn* v. *Planning & Zoning Commission*, 24 Conn. App. 430, 436, 589 A.2d 3, cert. denied, 219 Conn. 908, 593 A.2d 133 (1991).

"The plan of conservation and development or master plan prepared by the planning commission under section 8-23 is not the same thing as the comprehensive plan, which is a zoning concept. The comprehensive plan is a general plan to control and direct the use and development of property in a municipality or in a large part of it by dividing it into districts according to the best and potential uses of the properties. The comprehensive plan consists of the zoning regulations themselves and the zoning map which has been established pursuant to those regulations." 9 R. Fuller, supra, § 21:15, pp. 642–43. Although zone changes must be in accordance with the comprehensive plan, "[t]he recommendations in the plan of conservation and development designating appropriate uses for various areas in the municipality is merely advisory to and does not bind the zoning commission." Id., p. 641.

The Milford zoning regulations set forth the following: "*Section 1.1—Purposes* There is hereby established a comprehensive zoning plan for the [c]ity of Milford, which plan is set forth in the text, schedule, and maps, all of which constitute these [r]egulations. Said plan is adopted for the purposes set forth in the General Statutes of the [s]tate of Connecticut and is consistent with the policies and objectives of the [p]lan of [c]onservation and [d]evelopment, dated September 20, 2002, which, in the interest of protecting and promoting the public health, safety and welfare, shall be deemed to include the following, among others: *1.1.1 Existing Development:* The protection of the character of existing built-up areas and the enhancement of the appearance of the community as a whole. *1.1.2 Historic*

*sites:* The preservation of sites, buildings and uses of historical significance to the community. . . ."

The plan provides in relevant part: "During the neighborhood and topical meetings, there were several comments related to the need to protect historic resources in Milford. There were concerns raised about enforcement of regulations within the existing historic district as well as negative impacts on individual historic structures. Interest was expressed in the creation of a second historic district in the area south of the downtown. There is a need to pay more attention to the design of new development in order not to adversely impact the traditional architecture and New England charm of individual properties and areas in Milford. . . . In addition, an approach to some neighborhood centers may be to strengthen them through . . . mixed-use development. During the neighborhood meetings many people commented on the lost charm of Milford when there used to be local merchants supported by neighborhood business. An initiative to revitalize these centers should be examined through the plan update."

Throughout the entirety of the plan, there is much discussion on preserving neighborhood character and historic preservation. The plan also contains a section entitled "Milford Center Plan," which explains that "Milford Center is the historic center of the community dating back to the original [t]own [p]lot with its Line of Palisade as shown on a plan dating to 1646." It goes on to state that the traditional downtown portion of the center is where goods and services are available and where government offices are located. "Of equal importance in shaping the character of Milford Center are the residential neighborhoods surrounding the downtown. . . . Future development in Milford Center should recognize the importance of the residential neighborhoods as a customer base while protecting the neighborhoods from negative impact."

Directly considering the propriety of expanding the MCDD to include the subject properties, Giner, the board's planning expert, opined in his letter to the board that "[t]he 2002 [plan] appears to recognize that [the subject] area, [which is] to the west of the current center, may be in flux and could possibly become part of the center at some future point. There is general discussion about the future of the [MCDD] and the possibility for expansion. However, I could find no specific discussion of the subject area with respect as to why or why not the [MCDD] boundaries ought to extend beyond their current borders. The proposed land use map shows this area as potential [MCDD] perhaps anticipating that the impacts of the adjacent center may become so great as to someday render use of the property as residential space impossible. My review of the present situation leads me to believe that this is not the case yet. . . . The fact that the [plan] indicates that this area may merit future consideration as part of the [MCDD] does not automatically seal the fate of these properties to such zoning."

During the April 20, 2004 hearing, Betsey Wright, a former member of the board, who chaired the planning committee while it was putting together the plan, also spoke. Wright stated that when the planning committee saw the initial land use map, the members thought there were many errors contained therein. She stated that they also believed that the map showing the MCDD over the plaintiff's property was in error and that they told the plaintiff that as well. Wright stated that the committee informed the plaintiff during this time "that her house . . . and an outbuilding in the back [were] very important for preservation and that . . . [the] neighborhood as it stood was . . . important . . and [that they] were concerned about the nibble, nibble factor . . . let[ting] one more historic piece of property go . . . ." She also stated that she told the plaintiff that they "needed to preserve the history of our community."

At the board's May 4, 2004 meeting, the board discussed Wright's remarks concerning the errors in the map. It also was stated that "the issue [regarding the plaintiff's property] started back when [the board was] putting in the plan of development . . . ." Much of the board's discussion at the meeting centered on the desire to preserve the character of the neighborhood and the concern for historical aspects of the neighborhood and the subject properties, the same concerns expressed throughout the plan. Although the board may not have stated on the record that it was considering the plan when it rendered its decision, certainly many of the factors it raised were concerns expressed throughout the plan. Additionally, the board had heard its own expert and a former member of the board at the public hearing two weeks earlier explain relevant aspects of the plan in relation to the plaintiff's property. Further, board members repeatedly stated that the properties were zoned residential and that they should remain as such. Accordingly, we conclude that the board did take into consideration the plan, as well as the comprehensive plan, when deciding the propriety of expanding the MCDD. Our review of the record supports the court's conclusion that the board's decision was not arbitrary, illegal or an abuse of its discretion.

The judgment is affirmed.

In this opinion the other judges concurred.