[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 I. STATEMENT OF APPEAL
Docket No. 177807 (Gateway III)
CT Page 16432
In this case, hereinafter referred to as Gateway III,[1] the plaintiff, Gateway Park Associates, LLC (Gateway) appeals from a decision of the defendant planning and zoning commission of the town of Greenwich (Commission), denying the site plan and special permit application of the defendants, Pemberwick Apartments, LLC (Pemberwick) and Smith-Groh, Inc. (Smith-Groh)
Docket No. 177355 (Smith-Groh II)
In this case, hereinafter referred to as Smith-Groh II,[2] the plaintiffs, Smith-Groh, Inc. (Smith-Groh) and Pemberwick Apartments, LLC (Pemberwick), appeal from a decision of the defendant planning and zoning commission of the town of Greenwich (Commission), denying their site plan and special permit applications.
II. BACKGROUND
The 1998 Application and Preliminary Approval
In 1998, Pemberwick applied to the Commission for site plan approval and a special permit to construct a twenty-seven unit apartment building on a parcel of property (the premises) located in Greenwich. (Gateway I,[3] Return of Record [ROR], Items 4-6, 35.) Previously, in 1989, the Commission granted final site plan and special permit approvals for the construction of an apartment building on the premises, and also approved a change in the zoning of the premises from an R-6 to an R-PHD-SU zone.[4] (ROR, Item 22d.) According to Pemberwick's application, the twenty-seven unit apartment building that Pemberwick sought to construct was similar to the proposed construction previously approved by the Commission in 1989. (Gateway I, ROR, Items 4-6.) By decision letter dated January 20, 1999, the Commission preliminarily approved the site plan,[5]
described the premises as being located within the R-PHD-SU zone, and advised Pemberwick to proceed to final submission, subject to twenty modifications.[6] (Supplemental ROR, Item A.) Subsequently, the Commission denied Pemberwick's related request for a special permit, "without prejudice on an administrative basis for expiration of time." (Gateway I, ROR, Item 79.)
The 1999 Final Application and its Denial
Thereafter, on August 12, 1999, Pemberwick submitted an application seeking final site plan approval and a special permit to construct the twenty-seven unit apartment building on the premises. (Smith Groh, ROR, Items 4,4a-41.) While Pemberwick actually filed this application, Smith-Groh has been the record owner of the premises since September 3, CT Page 16433 1999.[7] (Smith-Groh's Trial Exh. 1, warranty deed.) On December 8, 1999, the Commission unanimously voted to deny the application. (Supplemental ROR, Item 10a, p. 44-46.) By decision letter dated December 20, 1999, revised December 22, 1999, the Commission noted that the application proposed a twenty-seven unit apartment building including five moderate income dwelling units, and indicated that those five units were to be "deed restricted" units.[8] (ROR, Item 22c, p. 1, 3.) Nevertheless, the Commission denied the final site plan and special permit application, for the reasons that (1) the dwelling unit sizes proposed for the building were too large and thus failed to comply with Greenwich's zoning regulations pertaining to R-PHD-SU zones, and (2) the overall size of the building was too large.[9] (ROR, Item 22c.)
The 2000 Final Application and its Denial
Docket No. 177807 (Gateway III); Docket No. 177355 (Smith-Groh II)
Most recently, by application dated January, 2000, Smith-Groh and Pemberwick applied to the Commission for final site plan and special permit approvals to construct a twenty-seven unit apartment building on the premises. (ROR, Items 1-3.) This application is the subject of both the Smith-Groh II and the Gateway III appeals. According to this application, the dwelling unit sizes proposed for the apartment building had been reduced (to an average of 648.5 square feet for the one bedroom apartments and an average of 814 square feet for the two bedroom apartments), in response to the Commission's stated reasons for denying the previous final site plan and special permit applications. (ROR, Item 2.) Furthermore, according to this application, the overall height of the building had been reduced (to an elevation of 57.5 feet), the overall width of the building had been reduced (by three feet) and there had been a (one foot) reduction in the length of the north end of the building. (ROR, Item 2.) A public hearing on this application was held by the Commission on February 15, 2000. (ROR, Item 45.)
At a special meeting held by the Commission on March 13, 2000, the Commission discussed and voted on the application. (ROR. Item 48.) In response to a motion to approve the application, two Commission members voted in favor of its approval, two members voted against its approval, and one member abstained from the vote. (ROR. Item 48, p. 49-52.) Therefore, the Commission concluded that the motion was "denied for failure to carry." (ROR, Item 48, p. 52.) The Commission's decision letter dated March 24, 2000, denies the application for the reasons that, inter alia, (1) the Commission could not find that the project met the standards established for special permit approvals nor the standards, goals and intent of the town of Greenwich's plan of conservation and development, and (2) the motion to approve the site plan CT Page 16434 and special permit application failed to gain the required affirmative votes for approval. (ROR, Item 49, p. 5.) Specifically, the Commission stated in its decision letter, inter alia, that it was concerned that there were no residential units which were designated affordable, moderate income or reasonable cost dwelling units,[10] and because the building was too large and out of character for the neighborhood (ROR, Item 49, p. 3-5.)
On March 30, 2000, Smith-Groh and Pemberwick filed this appeal,Smith-Groh II, alleging that the Commission, in denying the final site plan and special permit application, acted illegally, arbitrarily and in abuse of its discretion in that: the application conformed to the zoning regulations; (Smith-Groh II Appeal, ¶ 16(f)); the denial of the application was based on an incorrect conclusion of the number or permitted size of the apartment units allowed under the zoning regulations, and was inconsistent with both the site plan approval granted by the Commission in 1989 and the preliminary site plan approval granted in January of 1999; (Smith-Groh II Appeal, ¶¶ 16(a), (d)); the reasons assigned by the Commission for denying the application are improper, inadequate and unsupported by the record; (Smith-Groh II
Appeal, ¶¶ 16(a)-(c), (e), (g), (h), (j)); and the site plan was approved by the Commission's tied vote. (Smith-Groh II Appeal, ¶ 16 (i).)
On April 26, 2000, Gateway filed its appeal, Gateway III, naming Smith-Groh, Pemberwick and the Commission as defendants, alleging, inter alia, that the Commission's decision recognizing the continued designation of the premises in the R-PHD-SU zone is illegal, arbitrary, unreasonable and in abuse of its discretion because, pursuant to section 6-74 of the zoning regulations, the R-PHD-SU zone designation approved by the Commission in 1989 terminated when its site plan expired for failure to commence construction on the subject premises within the three year time limitation of section 6-14.1 of the zoning regulations.[11]
(Gateway III Amended Appeal, ¶¶ 16(a)-(c).)
On May 30, 2000, this court ordered that Gateway, the owner of land that abuts the subject premises, be added as a party defendant inSmith-Groh II, in accordance with a stipulated agreement between the parties. On the same date and in accordance with the aforementioned stipulated agreement between the parties, this court ordered the consolidation of Smith-Groh II and Gateway III for trial.
 III. JURISDICTION
General Statutes § 8-8, as amended by Public Act No. 01-195, governs appeals taken from a planning and zoning commission to the CT Page 16435 Superior Court. "A statutory right to appeal may be taken advantage of only by strict compliance with the statutory provisions by which it is created." (Internal quotation marks omitted.) Testa v. Waterbury,55 Conn. App. 264, 268, 738 A.2d 740 (1999).
Aggrievement
"[P]leading and proof of aggrievement are prerequisites to the trial court's jurisdiction over the subject matter of a plaintiff's appeal."Jolly, Inc. v. Zoning Board of Appeals, 237 Conn. 184, 192, 676 A.2d 831
(1996). "In the case of a decision by a . . . planning and zoning commission . . . `aggrieved person' includes any person owning land that abuts or is within a radius of one hundred feet of any portion of the land involved in the decision of the [commission]." General Statutes § 8-8 (a)(1), as amended by P.A. No. 01-195.
Docket No. 177807 (Gateway III)
Gateway alleges that it owns land that directly abuts the subject premises. (Gateway III Amended Appeal, ¶ 15.) At a hearing held by this court on August 3, 2001, Gateway was found to be an aggrieved person pursuant to General Statutes § 8-8 (a)(1), in that it is the owner of land that abuts the subject premises involved in the site plan and special permit application.
Docket No. 177355 (Smith-Groh II)
Smith-Groh and Pemberwick allege that Smith-Groh, as the owner of the subject property, and Pemberwick, as the contract purchaser and applicant to the Commission, are aggrieved by the Commission's denial of the application. (Smith-Groh II Appeal, ¶ 15.) At a hearing held by this court on August 3, 2001, Smith-Groh was found to be an aggrieved person pursuant to General Statutes § 8-8 (a)(1), in that it is the owner of the land involved in the site plan and special permit application. As to Pemberwick's aggrievement, two witnesses, namely, Donald Smith (Smith), an officer and shareholder in Smith-Groh, and Tim Crowley (Crowley), the owner of Crowley Group, an entity that is a fifty percent partner in Pemberwick, gave testimony relating to Pemberwick's interest in the subject premises. The Commission and Gateway objected to Pemberwick's status as aggrieved on the ground that Pemberwick failed to provide the court or the parties with any documentary evidence to demonstrate Pemberwick's interest in the subject premises. Consequently, at the hearing, this court reserved judgment as to Pemberwick's aggrievement and provided the parties with an opportunity to file supplemental memoranda on the issue. CT Page 16436
This court notes that "[t]wo broad yet distinct categories of aggrievement exist, classical and statutory." Lewis v. Planning ZoningCommission, 62 Conn. App. 284, 288, 771 A.2d 167 (2001). Smith-Groh and Pemberwick do not argue that Pemberwick is aggrieved within the meaning of General Statutes § 8-8 (a)(1). Rather, they argue that Pemberwick is classically aggrieved.
The Connecticut Supreme Court recently explained that classical aggrievement "is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected. . . . We traditionally have applied the following two part test to determine whether [classical] aggrievement exists: (1) does the allegedly aggrieved party have a specific, personal and legal interest in the subject matter of a decision; and (2) has this interest been specially and injuriously affected by the decision." (Citations omitted; internal quotation marks omitted.) Gladysz v. Planning ZoningCommission, 256 Conn. 249, 255-56, 773 A.2d 300 (2001). "Because aggrievement is a jurisdictional question, and therefore, the key to access to judicial review, the standard for aggrievement is rather strict." (Internal quotation marks omitted.) Id., 257. The burden of proving aggrievement is on the plaintiff. Mystic Marinelife Aquarium,Inc. v. Gill, 175 Conn. 483, 493, 400 A.2d 726 (1978). The determination of aggrievement presents a question of fact for the trial court. McNallyv. Zoning Commission, 225 Conn. 1, 7, 621 A.2d 279 (1993).
In their supplemental memorandum, Smith-Groh and Pemberwick argue that Pemberwick satisfies the two part test for classical aggrievement be cause: (1) Pemberwick was the applicant for the preliminary and the final site plan approvals; (2) Smith-Groh is a fifty percent partner in Pemberwick; (3) the other fifty percent partner in Pemberwick is the Crowley Group, owned by Tim Crowley (Crowley); (4) Pemberwick is the developer of the subject premises, acting for Smith-Groh and the Crowley Group; and (5) pursuant to a contract between Smith-Groh and Crowley, Smith-Groh contributes the land and Crowley contributes other assets or services to jointly develop the subject premises under the entity known as Pemberwick; (6) Pemberwick will take title to the land when a development application is approved for the property; and (7) pursuant to the contract, Pemberwick acts as the representative for its partners, Smith-Groh and Crowley Group, and has incurred large sums of money in pursuing the applications and related development expenses, despite legal title to the premises remaining with Smith-Groh. Furthermore, Smith-Groh and Pemberwick argue that the testimony furnished by Smith and Crowley confirmed the basic terms of the contract giving Pemberwick the right to purchase the land, and that the contract remains in effect. Smith-Groh and Pemberwick conclude that they have sufficiently demonstrated the possibility that Pemberwick's interest has been adversely affected by the CT Page 16437 Commission's decision and therefore, Pemberwick should be found to be aggrieved.
This court finds, however, that Smith-Groh and Pemberwick have not satisfactorily demonstrated aggrievement as to Pemberwick. Pemberwick claims to have a specific, personal and legal interest in the development of the subject premises. At a hearing held by this court, the witnesses for Smith-Groh and Pemberwick testified generally that the terms of a certain contract afford Pemberwick with an opportunity to develop and purchase the subject premises. This court finds their testimony to be equivocal and vague. Moreover, Pemberwick has not provided this court with any kind of written contract or other documentary evidence to demonstrate the terms of any relevant contract, the parties thereto, or beneficiaries thereunder. Other than the evidence in the record which indicates that Pemberwick was an applicant to the Commission, this court has no competent evidence from which it can determine the nature of Pemberwick's interest, if any, in the subject premises. Although the interest which supports a finding of aggrievement need not necessarily be confined to an ownership interest in real property; see Mystic MarinelifeAquarium, Inc. v. Gill, supra, 175 Conn. 493; the determination of aggrievement presents a question of fact for the trial court, and this court finds Pemberwick's interest in the subject matter of the Commission's decision to be unspecific and vague. See generally, Gladyszv. Planning Zoning Commission, supra, 256 Conn. 255-59 (discussing distinction between aggrievement and standing to apply to a planning and zoning commission). Consequently, this court finds that Pemberwick has not evidenced the first prong of the test for aggrievement, namely, "aspecific, personal and legal interest in the subject matter of [the] decision." (Emphasis added.) Id., 255.
Furthermore, this court finds that Pemberwick also fails the second prong of the test for aggrievement which prescribes that the requisite interest in the subject matter of the decision be shown to be specially and injuriously affected by the decision. As Pemberwick has failed to show that it has the requisite interest in the subject matter of the Commission's decision, any loss incurred by Pemberwick, financial or otherwise, similarly lacks a demonstrated nexus to the decision. SeeFareri v. Greenwich Inland-Wetlands, Superior Court, judicial district of Stamford/Norwalk at Stamford, Docket No. 15118 (October 21, 1997,D'Andrea, J.) (20 Conn.L.Rptr. 434) (construction contractor who applied to Inland Wetland and Watercourses Agency held not to be aggrieved, despite financial interest in outcome of wetlands permit). The issue of aggrievement, in the absence of supporting evidence, must be found against Pemberwick. See Mystic Marinelife Aquarium, Inc. v. Gill, supra, 175 Conn. 498. Accordingly, this court finds that Pemberwick has failed to prove aggrievement. Notwithstanding this court's finding as to CT Page 16438 Pemberwick, this court has jurisdiction over the subject matter of this appeal (Smith-Groh II) and may decide the merits of the case, since Smith-Groh's aggrievement has already been established. See ProtectHamden/North Haven v. Planning Zoning Commission, 220 Conn. 527, 529
n. 3, 600 A.2d 757 (1991) (only one plaintiff-appellant must prove aggrievement in order for court to decide merits of case).
Timeliness and Service of Process
An appeal shall be commenced by service of process within fifteen days from the date that the commission's notice of decision is published. See General Statutes § 8-8 (b), as amended by P.A. No. 01-195. Further, it shall be commenced by leaving the process with, or at the abode of, the clerk or chairman of the commission, and with the clerk of the municipality. See General Statutes § 8-8 (e), as amended by P.A. No. 01-195. Finally, although service of process shall also be made upon each person who petitioned or applied to the commission, failure to make such service within fifteen days on parties other than the commission shall not render the appeal untimely or deprive the court of jurisdiction over the appeal. See General Statutes § 8-8 (f), as amended by P.A. No. 01-195.
Docket No. 177807 (Gateway III)
An affidavit of publication dated March 20, 2000, reports that the Commission's notice of decision was published on that same date in theGreenwich Time newspaper, and an affidavit of publication dated March 23, 2000, reports that the Commission's "corrected notice" of decision was published in the Greenwich Time newspaper on March 22, 2000. (Supplemental ROR, Items E, F.) On April 4, 2000, Gateway's appeal was commenced by service of process upon the Commission's chairperson and the town clerk. On April 5, 2000, process was served upon Smith-Groh by serving the process to Smith-Groh's president, and on April 11, 2000, process was served upon the agent authorized to accept service of process for Pemberwick. Accordingly, this court finds that the Gateway III appeal was timely commenced by service of process upon the proper parties.
Docket No. 177355 (Smith-Groh II)
An affidavit of publication dated March 20, 2000, reports that the Commission's notice of decision was published on that same date in theGreenwich Time newspaper, and an affidavit of publication dated March 23, 2000, reports that the Commission's "corrected notice" of decision was published in the Greenwich Time newspaper on March 22, 2000. (Supplemental ROR, Items E, F.) On March 24, 2000, Smith-Groh's appeal was commenced by service of process upon the Commission's Chairperson and CT Page 16439 the town clerk. Accordingly, this court finds that the Smith-Groh II
appeal was timely commenced by service of process upon the proper parties.
 IV. SCOPE OF REVIEW
In ruling upon a site plan and special permit application "a planning and zoning board acts in an administrative capacity. . . . Generally, it is the function of a zoning board or commission to decide within prescribed limits and consistent with the exercise of [its] legal discretion, whether a particular section of the zoning regulations applies to a given situation and the manner in which it does apply. The . . . trial court . . . decides whether the board correctly interpreted the section [of the regulations] and applied it with reasonable discretion to the facts. . . ." (Brackets in original; citations omitted; internal quotation marks omitted.) Irwin v. Planning Zoning Commission,244 Conn. 619, 627-28, 711 A.2d 675 (1998).
"In applying the law to the facts of a particular case, the board is endowed with a liberal discretion and its action is subject to review by the courts only to determine whether it was unreasonable, arbitrary or illegal." (Internal quotation marks omitted.) Id., 628. When "the zoning commission does state the reasons for its action, the question for the court to pass on is simply whether the reasons assigned are reasonably supported by the record and whether they are pertinent to the considerations which the commission is required to apply under the zoning regulations." Id., 629. Concerning factual questions "a reviewing court cannot substitute its judgment for that of the agency. . . . If there is conflicting evidence in support of the zoning commission's stated rationale, the reviewing court . . . cannot substitute its judgment as to the weight of the evidence for that of the commission. . . . The agency's decision must be sustained if an examination of the record discloses evidence that supports any one of the reasons given." (Citations omitted; internal quotation marks omitted.) Id.
 V. DISCUSSION
Docket No. 177807 (Gateway III)
The Commission's decision letter denying the final site plan and special permit application refers to the premises as being located within the R-PHD-SU zone, and explains that "the project site was originally re-zoned in June 1989 from R-6 to R-PHD-SU. . . ." (ROR, Item 49, p. 3.) The minutes from the Commission's meeting on the application confirm that the Commission regarded the zone change from 1989 as still in effect. (ROR, Item 48, p. 21, 43.) Gateway argues that the R-PHD-SU zone CT Page 16440 designation from 1989 has expired because the R-PHD-SU zone is a "floating zone" which cannot continue without its qualifying project. Gateway contends that the R-PHD-SU zone designation necessarily terminated because, pursuant to Greenwich's zoning regulations, the site plan that had been approved for the R-PHD-SU zone in 1989 has subsequently expired. Gateway concludes, therefore, that the zoning of the subject premises has reverted to its pre-1989 zoning designation, that of an R-6 zone. In response, Smith-Groh, Pemberwick and the Commission argue that the R-PHD-SU zone designation has not expired and remains valid. Smith-Groh and Pemberwick argue that the subject premises is not in a floating zone at all, and, furthermore, that there is no authority to support the proposition that the R-PHD-SU zone designation automatically expired or reverted to its prior designation, merely because the parcel of land was not put to a particular use within a prescribed time limit. The Commission argues that Gateway's appeal is rendered moot because the Commission ultimately denied the application, thereby eliminating any current controversy between the parties.
First, this court will address the Commission's argument that this (Gateway III) appeal is moot. Mootness implicates the subject matter jurisdiction of the court. Gagnon v. Planning Commission, 222 Conn. 294,297, 608 A.2d 1181 (1992). "The issue of subject matter jurisdiction can be raised at any time. . . . Once brought to the attention of the court, regardless of the form of the motion, it must be acted upon." (Citation omitted; internal quotation marks omitted.) Id. The Commission maintains that the denial of site plan and special permit application causes the issues raised by Gateway to lose their significance, in that there is no current controversy between the parties. "A case becomes moot when due to intervening circumstances a controversy between the parties no longer exists." Domestic Violence Sevices v. FOIC, 240 Conn. 1, 7, 688 A.2d 314
(1997). "[I]t is not the province of . . . courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow." Gagnon v.Planning Commission, supra, 222 Conn. 299. Therefore, if there is no longer an actual controversy in which the court can afford practical relief to the parties, the controversy is no longer justiciable and the court must dismiss the appeal. Domestic Violence Sevices v. FOIC, supra,240 Conn. 6.
In this case, this court finds that the Commission's denial of the application does not eliminate the controversy between the parties. Specifically, the question which still requires resolution in the GatewayIII appeal is whether the Commission erred in construing the subject premises to be designated in the R-PHD-SU zone. Accordingly, this court finds that the Gateway III appeal has not been rendered moot and therefore, it cannot be dismissed on this ground. CT Page 16441
Notwithstanding the foregoing, this court notes that the arguments and issues raised by Gateway in this appeal are the same as those raised by Gateway in its prior appeal, Gateway Park Associates, LLC v. Planning andZoning Commission of the Town of Greenwich, Superior Court, judicial district of Stamford/Norwalk at Stamford, Docket No. 176155 (Mintz, J.) (Gateway II).[12] Nevertheless, this court will revisit the arguments and issues raised by Gateway, in the light of the full record presented in Gateway III.
As noted above, Gateway contends that the R-PHD-SU zone is a floating zone that has expired. A floating zone is a special detailed use district of undetermined location in which the proposed type, size and form of structures must be pre-approved, and which is legislatively deemed in advance to be compatible with the area in which the zone is eventually placed, if specified standards in the zoning regulations are met. Heithausv. Planning Zoning Commission, 258 Conn. 205, 217, 779 A.2d 750
(2001); accord Schwartz v. Planning and Zoning Commission, 168 Conn. 20,22, 357 A.2d 495 (1975). A floating zone "differs from the traditional `Euclidean' zone in that it has no defined boundaries and is said to `float' over the entire area where it may eventually be established."Heithaus v. Planning Zoning Commission, supra, 258 Conn. 217. "Since the floating zone regulations establish a zone for a type of use with an undetermined location, the zone can technically be applied anywhere in the municipality." R. Fuller, 9 Connecticut Practice Series: Land Use Law and Practice (1999) § 3.8, p. 33. "The floating zone is a zoning district that is not mapped when adopted; at some later date the previously defined zone will be placed on the ground, usually at the request of the affected landowner(s)." T. Tondro, Connecticut Land Use Regulation (2d Ed. 1992) § 3.C.2b, p. 70. When an application to apply a floating zone to a particular property is granted, the zone boundaries of the area are altered and a new zone is carved out of an existing one. Heithaus v. Planning Zoning Commission, supra,258 Conn. 217; accord Homart Development Co. v. Planning and ZoningCommission, 26 Conn. App. 212, 215, 600 A.2d 13 (1991). In other words, once a floating zone "lands," the zone of the property is changed in the same way as a conventional zone change.
In this case, the record reveals that the Commission adopted the R-PHD-SU zone in 1970 in order "to encourage attractive, safe, decent and sanitary housing for all [t]own residents or employees, present and future, without regard to race, color, creed, national origin or economic status," and for the purpose of serving the housing needs of "those [t]own residents and employees who seek small residential units at reasonable cost." (ROR, Item 42b: minutes of regular meeting of the Commission held on March 17, 1970, p. 29-33; Item 53: Greenwich Zoning CT Page 16442 Regs., § 6-62 (a)-(b).) The only principal permitted use of the zone is for multi-family dwellings. (ROR, Item 53: Greenwich Zoning Regs., § 6-70.) Furthermore, the proposed type, size and form of structures to be placed within the R-PHD-SU zone must be pre-approved, and a site plan and other materials must be submitted to the Commission as part of an application for initial R-PHD-SU zone approval. (ROR, Item 53: Greenwich Zoning Regs., §§ 6-64 — 6-74.) Approval of an application requesting an R-PHD-SU zone change must follow a properly noticed public hearing, and such approval is based upon findings by the Commission that the specified purposes of the R-PHD-SU zone will be served and that the zone change will not be detrimental to the health, safety, property values and residential character of the neighborhood, nor materially adversely affect single family residential areas. (ROR, Item 53: Greenwich Zoning Regs., § 6-72.) According to Greenwich's regulations, however, an R-PHD-SU zone "may be located only in thoseareas shown on the town's plan of development for planned housing design
as adopted by the Commission and approved by the representative town meeting." (Emphasis added.) (ROR, Item 53: Greenwich Zoning Regs., § 6-63; Item 42b: minutes of regular meeting of the Commission held on March 17, 1970, p. 30.)
While the R-PHD-SU zone described above resembles what has been recognized as a "floating zone," the zone does not strictly fit that definition, since the Commission designated the areas in which the R-PHD-SU zone could be located by providing, in section 6-63 of the regulations, that the R-PHD-SU zone could only be placed "in those areas shown on the town's plan of development for planned housing design. . . ." (ROR, Item 53: Greenwich Zoning Regs., § 6-63; Item 42b: minutes of regular meeting of the Commission held on March 17, 1970, p. 30.) Consequently, the R-PHD-SU zone differs from a typical floating zone to the extent that it is a special detailed use district of determined, rather than undetermined, location; see Heithaus v. Planning ZoningCommission, supra, 258 Conn. 217; Schwartz v. Planning and ZoningCommission, supra, 168 Conn. 22; and to the extent that the areas potentially within the zoning district were mapped, rather than unmapped, when the zone was adopted. See T. Tondro, Connecticut Land Use Regulation (2d Ed. 1992) § 3.C.2b, p. 70. Even if this court were to characterize the R-PHD-SU zone as a floating zone, such a finding would not, by itself, advance Gateway's argument that the zone has expired. As noted above, when an application to apply a floating zone to a particular property is granted, the zone boundaries of the area are altered and a new zone is carved out of an existing one. Heithaus v. Planning ZoningCommission, supra, 258 Conn. 217; Homart Development Co. v. Planning andZoning Commission, supra, 26 Conn. App. 215. Stated differently, once a floating zone "lands," as the R-PHD-SU zone did upon the subject premises, the zone of the property is changed in the same way as a CT Page 16443 conventional zone change. Thus, even if the R-PHD-SU zone was a floating zone when adopted by the Commission in 1970, the zone "landed" or was placed on the ground in 1989, when the Commission approved the zone change for the subject premises. (ROR, Item 22d: 1989 approval letter; Item 54: revised building zone regulation map dated December, 1992.) (See alsoGateway I, ROR, Item 7: amendment to building zone regulation map dated July 31, 1990.)
Accordingly, this court must determine whether the R-PHD-SU zone designation for the subject premises has "floated away" or expired because, pursuant to Greenwich's zoning regulations, the site plan that had been approved in connection with the zone change has expired. As previously indicated, in 1989, the Commission approved a zone change for the subject premises from an R-6 zone (residential/multi-family dwelling zone) to an R-PHD-SU zone (residential planned housing design small unit zone). (ROR, Item 22d: 1989 approval letter; Item 53: Greenwich Zoning Regs., §§ 6-98 (R-6), 6-62 — 6-74 (R-PHD-SU).) Section 6-74 of the zoning regulations provides that, for the purpose of a zone change to an R-PHD-SU zone, "[f]ailure to comply with any time limit established bythe Commission as a condition for its approval shall render the zonechange null and void." (Emphasis added.) (ROR, Item 53: Greenwich Zoning Regs., § 6-74; Item 42a: memorandum of assistant town planner dated March 3, 1970, p. 1-2.) Under this provision, the Commission, in its discretion, could have established a time limit as a condition for its approval of the R-PHD-SU zone change for the premises. No such time limit was imposed by the Commission, however, when it approved the zone change in 1989. (ROR, Item 22d: 1989 approval letter.) By way of contrast, it is useful to compare the discretionary language of section 6-74 with the mandatory language contained in the "sunset provisions of sections 6-14.1 (regarding site plans) and 6-17 (regarding special permits). These "sunset provisions" provide for the automatic expiration or termination of site plan and special permit approvals if the subject land is not put to a particular use within a prescribed, three year time limit. Section 6-14.1(e) provides that "[a]ny site plan approval granted by the Commission on which construction has not started within a period of three years shall become null and void." (ROR, Item 53: Greenwich Zoning Regs., § 6-14.1(e).) Similarly, section 6-17 (f) provides that "[a]ny special permit granted by the Commission and not exercised within a period of three (3) years from date of decision shall become null and void." Importantly, neither the Greenwich regulations nor the General Statutes include "sunset provisions" imposing automatic, prescribed time limitations on R-PHD-SU zone changes. This court notes that section 6-71 (a)(2) of the regulations (governing applications for initial R-PHD-SU zone approval) incorporates the requirements of sections "6-13 to 6-16.1 inclusive." (ROR, Item 53: Greenwich Zoning Regs., §§ 6-71, 6-13 — 6-16.1.) The provisions of sections 6-13 through 6-16.1, CT Page 16444 however, do not place any time limitations on zone changes nor do they suggest that an R-PHD-SU zone change is necessarily dependent upon the continued validity of a site plan or special permit.
Consequently, since the Commission did not establish or impose any time limit, pursuant to section 6-74, as a condition for its 1989 approval of the R-PHD-SU zone change on the premises, and since no statute or Greenwich regulation includes a "sunset provision authorizing the automatic expiration of an R-PHD-SU zone change, this court finds and concludes that once the 1989 zone change had been approved, it was not capable of automatic expiration or reversion to a former zone designation.[13] In other words, in order to change the zoning of the subject premises from its R-PHD-SU designation to another type of zone, affirmative steps must be taken in accordance with the zoning regulations. See e.g., General Statutes 8-3 (procedures for establishment and changing of zoning regulations and districts); Greenwich Zoning Regs., § 6-22 (authorizing zoning text or map amendments by petition of one or more property owners or the Board of Appeal, or by the Planning and Zoning Commission on its own motion). This court finds that the R-PHD-SU zoning of the subject premises has not been so changed.
In light of the above, this court finds, contrary to Gateway's assertions, that the R-PHD-SU zone designation approved in 1989 for the subject premises has not expired, despite the fact that project associated with the zone change was never constructed. This court finds that the Commission correctly interpreted the relevant sections of the zoning regulations and applied them with reasonable discretion to the facts. See Irwin v. Planning Commission, supra, 244 Conn. 628. Furthermore, this court finds that substantial evidence in the record supports the Commission's continued recognition of the premises as within the R-PHD-SU zone and therefore, Gateway's appeal cannot be sustained on this ground. Accordingly, Gateway's appeal in Gateway III must be dismissed.
Docket No. 177355 (Smith-Groh II)
In the decision letter denying the site plan and special permit application at issue in this case, the Commission assigned the reasons that, inter alia, (1) the Commission could not find that the project met the standards established for special permit approvals nor the standards, goals and intent of the town of Greenwich's plan of conservation and development, and (2) the motion to approve the site plan and special permit application failed to gain the required affirmative votes for approval.[14] (ROR, Item 49, p. 5.) Specifically, the Commission stated in its decision letter, inter alia, that it was concerned that there were no residential units which were designated CT Page 16445 affordable, moderate income or reasonable cost dwelling units. (ROR, Item 49, p. 3-5.)
Smith-Groh argues[15] that the reasons assigned by the Commission for denying the application were improper and inadequate and furthermore, that the site plan was approved by the Commission's tie vote on the application. In response, Gateway and the Commission argue that the Commission's denial of the application was lawful and amply supported by the record and the zoning regulations, and that the Commission's tie vote constituted a denial of the application.
First, this court will address Smith-Groh's argument that the site plan was approved by the Commission's tie vote on the application. This court notes that ordinarily, a majority vote of a quorum of an administrative agency is sufficient to approve an application for a site plan or special permit. See generally, R. Fuller, 9 Connecticut Practice Series: Land Use Law and Practice (1999) § 21.7, p. 459. Furthermore, "the failure of an application to garner enough votes for its approval amounts to a rejection of the application." Merlo v. Planning Zoning Commission,196 Conn. 676, 683, 495 A.2d 268 (1985); see Huck v. Inland Wetlands Watercourses Agency, 203 Conn. 525, 533-35, 525 A.2d 940 (1987) (motion to grant permit application with conditions lost on tie vote, resulting in substantive denial); Lupinacci v. Planning Zoning Commission,153 Conn. 694, 696, 220 A.2d 274 (1966) (applications for zone change and to amend plan of development to include zone change lost on tie vote, two in favor and two opposed); Hall v. Planning Zoning Board, 153 Conn. 574,576, 219 A.2d 445 (1966) (motion to grant application for zone change lost on tie vote of four in favor, four against and one abstention);Wittemen v. Redding Zoning Commission, Superior Court, judicial district of Danbury, Docket No. 328715 (March 6, 1998, Radcliffe, J.) (21 Conn.L.Rptr. 517) (where motion to deny site plan application resulted in tie vote and commission's chairperson ruled that this amounted to approval of application, court held that tie vote couldnot be interpreted as functional equivalent of approval); R. Fuller, 9 Connecticut Practice Series: Land Use Law and Practice (1999) § 21.7, p. 459 ("[w]here there is a tie vote on a motion to approve an application, it amounts to a denial of the application.") Moreover, "[u]nder common law or parliamentary law, an affirmative resolution or action which is the subject of a tie vote fails of adoption."Huck v. Inland Wetlands Watercourses Agency, supra,203 Conn. 533 n. 8.
Smith-Groh argues, however, that General Statutes § 8-3 (g) requires the approval of any site plan unless a motion to deny or modify it is adopted within the statutory time limit for action on site plans. Smith-Groh contends that in this case, while the Commission's vote failed to approve the site plan as a result of the tie vote, it did not deny it CT Page 16446 and therefore, the site plan was automatically approved under General Statutes § 8-3 (g). Smith-Groh cites no case law in support of this proposition.
General Statutes § 8-3 (g) provides, in relevant part: "Approval of a site plan shall be presumed unless a decision to deny or modify it is rendered within the period specified in section 8-7d." This provision of General Statutes § 8-3 (g) was discussed in the case of Wittemen v.Redding Zoning Commission, supra, 21 Conn.L.Rptr. 517. The Wittemen
court explained that the purpose of General Statutes § 8-3 (g) is to ensure the timeliness of an administrative agency's review of site plan applications and does not affect the parliamentary construction or result of the vote itself. Id; see also Huck v. Inland Wetlands WatercoursesAgency, 203 Conn. 525, 531-35, 525 A.2d 940 (1987) (finding that General Statutes § 22a-42a, applicable to municipal inland wetlands agencies, ensures timeliness of agency's action rather than result of tie vote on a motion to approve an application).
In this case, the motion to approve the application did not receive the majority vote necessary for approval, and the Commission itself regarded its vote as a denial of the application. (ROR, Item 48, p. 49-52.) The notice published in the Greenwich Time newspaper informed Smith-Groh and the public of the Commission's denial of the application. Furthermore, the Commission's decision letter stated the denial and the reasons therefor and Smith-Groh does not contend that it was not timely notified of the Commission's decision. Consequently, this court finds that the Commission did render a decision denying Smith-Groh's site plan application, within the plain meaning of General Statutes § 8-3 (g). Accordingly, Smith-Groh's appeal cannot be sustained on this ground.
Next, this court will address Smith-Groh's argument that the absence of affordable housing units was not a valid reason to refuse to approve the application, as the applicable regulations do not require "affordable housing." In its memorandum, Smith-Groh concedes that while the number of apartment units it proposed in each of its applications to the Commission remained the same, the prior applications indicated that five of the twenty-seven units would be affordable units, but the application that is the subject of this appeal no longer designated the affordable units. (Smith-Groh memorandum, (9/21/00), p. 6, 7, 18.) The elimination of the five affordable, moderate income or reasonable cost dwelling units was discussed at both the public hearing and the Commission's meeting on the application. (ROR, Item 45: transcript from public hearing, p. 16-24; Item 48: minutes from Commission's meeting, p. 19, 23-24, 30-34.) Furthermore, the Commission specifically stated, in its decision letter denying the application, that unlike the prior applications proposing the construction of an apartment building on the premises, the subject CT Page 16447 application no longer included any residential units which were designated affordable, moderate income or reasonable cost dwelling units. (ROR, Item 49, p. 3-5.)
This court notes that the regulations required the Commission to determine whether Smith-Groh's application met the standards set forth in the regulations pertaining to site plans, special permits and those pertaining to the zoning of the subject premises, specifically, the R-PHD-SU zone. Section 6-15 of the regulations contains the standards to be applied by the Commission in its review of site plan applications. Greenwich Zoning Regs., § 6-15. Section 6-17 of the regulations requires the Commission to consider, in its review of a special permit application, the aforementioned site plan standards and furthermore, section 6-17 requires the Commission to determine whether an applicant's proposed use conforms with both the intent of the zoning regulations and "the purposes of [the] zone, where defined." Greenwich Zoning Regs., § 6-17 (a), (d). Thus, section 6-17 incorporates section 6-62 of the regulations, which sets forth the intent of R-PHD-SU regulations[16]
and defines the purposes of the R-PHD-SU zone, which must be accomplished by applicants seeking to enjoy the benefits of developing in the zone. Greenwich Zoning Regs., § 6-62 (a)-(c). Specifically, section 6-62 (c) sets forth the purposes of the R-PHD-SU zone, and provides, in pertinent part: "The [p]lanning and [z]oning [c]ommission . . . may permit residential development that conforms to the standards and requirements described herein when all of the following purposes are to beaccomplished: (1) To implement the letter and intent of the Town Plan of Development; (2) To maintain and reinforce the Town's predominantly residential character; (3) To conserve and preserve land to assure that its development will best maintain and enhance the appearance, character and natural beauty of an area; (4) To provide attractive, decent and suitable housing at reasonable cost for those who live or work in Town; (5) To permit the construction of residential units that may be subsidized by public and/or private funds." (Emphasis added.) Greenwich Zoning Regs., § 6-62 (c). Accordingly, this court finds that the regulations clearly required the Commission to determine that Smith-Groh's application accomplished the purposes of the R-PHD-SU zone, including the purpose of providing "housing at reasonable cost." Id., § 6-62 (c)(4).
Smith-Groh contends that the "reasonable cost" requirement is satisfied by the small size of the proposed apartment units. At the public hearing on Smith-Groh's application, a point was made that small unit size is not necessarily the determining factor for rental costs; rather, proximity to places of employment and shopping can increase desirability and rental costs. (ROR, Item 45, p. 53-54.) Moreover, this court notes that the R-PHD-SU zone offers developers a density bonus by permitting a large CT Page 16448 number of units per lot. It follows that the provision of housing at reasonable cost is the quid pro quo for the density bonus. Furthermore, the wording of the R-PHD-SU regulations support the existence of a distinction between unit size and reasonable cost. For example, section 6-62 (b) of the regulations provides that the intent of the R-PHD-SU regulations is "to permit . . . a type of residential development that will serve the housing needs of those [t]own residents and employees who seek small residential units at reasonable cost." (Emphasis added.) Greenwich Zoning Regs., § 6-62 (b). To interpret "small residential units" as synonymous with reasonable cost" would render the term "reasonable cost" superfluous, or meaningless. "Whenever possible, the language of zoning regulations will be construed so that no clause is deemed superfluous, void or insignificant." Planning and ZoningCommission v. Gilbert, 208 Conn. 696, 705, 546 A.2d 823 (1988). Consequently, this court finds, contrary to Smith-Groh's assertion, that small unit size alone does not necessarily satisfy the reasonable cost requirement of section 6-62 (c)(4) of the regulations.
This court notes, however, that the regulations neither define what constitutes "housing at reasonable cost," nor contain a specific rent restriction formula for the R-PHD-SU zone. See Greenwich Zoning Regs., § 6-62. The record reveals that to address this requirement, the Commission has consistently imposed conditions pertaining to cost on any construction proposed for the premises since 1989, the year that the zoning of the premises was changed from an R-6 to an R-PHD-SU designation. First, this court notes that in the 1989 decision letter approving the zone change and also approving a site plan and special permit, the Commission found that the proposed project, a twenty-seven unit apartment building, was "consistent with the purposes of [R-PHD-SU zoning regulations]," and that "in order to further the purpose of providing affordable housing the developer is restricting five units to rent regulation in accordance with the [moderate income dwelling unit] criteria of [sections] 6-110 (g)(4) and 6-110 (g)(5) of [the regulations]."[17] (ROR, Item 22d, p. 1.) Thus, the 1989 decision letter specifies that the site plan and special permit approvals were granted subject to modifications or conditions, including: "[t]hat an appropriate mechanism and/or instrument(s) be submitted for the establishment and maintenance of rent-regulation and administration of rent-regulated units in accordance with the standards of [sections] 6-110 (g)(4) and 6-110 (g)(5) of [the regulations];" (ROR, Item 22d, p. 1, ¶ 1); and "[t]hat the following note be placed on the final plan: "No building permit shall be issued for the structure if it fails to identify on the plans, the approved location of the five deed restricted moderate income dwelling units. Any change in the number of moderate income units . . . will be considered a modification requiring revised special permit and site plan approval by the [Commission]." (ROR, Item 22d, p. 3, ¶ CT Page 16449 10.)
Second, in the Commission's decision letter dated January 20, 1999 (which preliminarily approved a site plan application for the premises),[18] the Commission noted that "a site plan was approved for the [premises] in a R-PHD-SU zone in 1989 and the intent of the [R-PHD-SU] zone was to provide small unit, diversified more moderate cost [housing] and the applicant has proposed 5 [five] affordable housing units . . . which will be deed restricted for affordable units." (Supplemental ROR, Item A, p. 1.) Correspondingly, in the preliminary approval letter, the Commission imposed the following modification or condition: "Identification of the 5 [five] affordable units and the deed restrictions for those units [to] be submitted at the time of [the] final application." (Supplemental ROR, Item A, p. 2, ¶ 11.)
Third, in the decision letter denying the final site plan and special permit application dated December 20, 1999, revised December 22, 1999,[19]
the Commission noted that the application proposed a twenty-seven unit apartment building including five moderate income dwelling units, and indicates that these five units were to be "deed restricted" units. (ROR, Item 22c, p. 1, 3.) The Commission denied the application, however, on other grounds. (ROR, Item 22c.)
Fourth and finally, in its decision letter denying the application at issue in this appeal, the Commission expressed its concern that the purposes of the zone had not been met, particularly section 6-62 (c)(4) of the regulations, regarding reasonable cost housing. (ROR, Item 49, p. 3.) The Commission found and stated that "this application has been significantly changed from the previous submissions with the removal of all five designated affordable units from the project. These five designated units have been included in the original approval in 1989 and in subsequent applications in 1998 and 1999, adapting the provisions for affordable moderate income dwelling units[20] found in section 6-110 (g)(4) and (5) of the . . . regulations which establishes income standards and rental/sales costs in perpetuity by deed restriction and with the program administered and monitored by the Greenwich Community Development Office; and . . . there remain concerns on the Commission on how reasonable in cost these units will really be, that the significant density increase will only provide more units but not necessarily offered at reasonable prices due to the high demand of the Greenwich market; and . . . the loss of the five designated moderate income dwelling units removes the single guarantee of verifiable, reasonably priced housing at this complex and whose density was designed as an incentive for deed restrictive affordable units." (ROR, Item 49, p. 4-5.)
A review of the record supports the Commission's determination that the CT Page 16450 twenty-seven unit apartment building proposed by Smith-Groh failed to demonstrate compliance with the "reasonable cost" requirement of section 6-62 (c)(4) of the regulations. At the public hearing on this application, Smith-Groh, through its attorney, indicated that the units might rent for $1,172 per month, and opined that freely floating market rates for the units would be reasonable when compared to the more expensive housing ordinarily desired by Greenwich's "captains of industry." (ROR, Item 45, p. 18-25.) (See also Smith-Groh's memorandum, (9/21/00), p. 21) Furthermore, during the Commission's deliberation on the application, the Commission members noted that the permanent density bonuses could not be justified by temporary or unenforceable compliance with the purposes of the R-PHD-SU zone. (ROR, Item 48, p. 19, 23-24, 30-34). Thus, with neither the deeded rent restrictions nor any alternatively demonstrated commitment by Smith-Groh to provide reasonable cost units, the Commission could not find that the application conformed with the requirements of section 6-62 (c)(4). (ROR, Item 49.)
In light of the above, this court finds that the Commission's denial of the application for failure to meet the standards established for special permit approvals was lawful and supported by substantial evidence in the record. This court finds that the Commission correctly interpreted the relevant sections of the zoning regulations, specifically, section 6-17 (special permit standards), as it incorporates section 6-62 (intent and purposes of R-PHD-SU zone), and applied them with reasonable discretion to the facts. See Irwin v. Planning Commission, supra, 244 Conn. 628. Hence, this court finds that the Commission's denial of the application for failure to meet the purpose of providing housing at reasonable cost pursuant section 6-62 (c)(4) of the regulations must be sustained. Accordingly, Smith-Groh's appeal in Smith-Groh II must be dismissed.
 VI. CONCLUSION
For the foregoing reasons, Gateway's appeals in Gateway III and Smith-Groh's appeal in Smith-Groh II, respectively, are hereby dismissed.
MINTZ, J.